**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,**

v.

**The PEOPLE'S REPUBLIC OF THE CONGO, Defendant.**

**No. 88 CV 6142 (KMW).**

United States District Court, S.D. New York.

Dec. 22, 1989.

John A. Herfort, Gibson, Dunn & Crutcher, New York City, for plaintiff.

Roger Boyle, Boyle, Vogeler & Haimes, New York City, for defendant.

## OPINION AND ORDER

KIMBA M. WOOD, District Judge.

On October 23, 1987, the National Union Fire Insurance Company of Pittsburgh ("NUFI") obtained a default judgment in Great Britain in the amount of $22,457,-273.62 against defendant People's Republic of the Congo ("the Congo"). The default judgment arose out of the Congo's failure to repay a loan and subsequent failure to appear in the British action against it. This action seeks recognition and enforcement of the default judgment pursuant to the federal Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602–11, and the New York Uniform Foreign Country Money–Judgments Recognition Act, CPLR §§ 5301–09. Both sides have moved for summary judgment.[1] For the reasons discussed below, plaintiff's motion is granted, and defendant's cross-motion is denied.

## FACTS

The Congo issued a promissory note dated March 8, 1984 to Meridien International Bank Limited ("Meridien") in the amount of $26,425,000 pursuant to the terms of a Credit Facility Agreement executed on December 13, 1983 between the Congo and Meridien ("the Agreement"). *See* Writ endorsed with a Statement of Claim issued in the English High Court of Justice, Chancery Division ("the Writ"), Exh. A to Rocher Aff. of Jan. 4, 1989, at 2 and 5; Agreement, App. 1 to NUFI's Appendix of Commercial Documents. NUFI became the insurer of the Congo's obligations under the Note by a written insurance policy, effective March 8, 1984, taken out by Bankers Trust Company, which had been assigned the Note effective March 1, 1984. Writ at 7.

The Congo failed to make payments due on February 3, 1986, August 1, 1986, and February 3, 1987. Pursuant to the terms of its insurance policy, NUFI made the payments, with interest, to Bankers Trust. *Id.* at 8. By a written assignment dated July 13, 1987, Bankers Trust transferred and assigned its right, title, and interest in the Note to NUFI. *Id.* at 4, 9. On July 14, 1987, Meridien similarly transferred and assigned its rights under the Agreement to NUFI. *Id.* at 9.

By telex dated July 14, 1987, NUFI notified the Congo that its obligations under the Note were due and owing as a result of the Congo's default. *Id.* at 10. On July 15, 1987, NUFI issued a Writ endorsed with a Statement of Claim against the Congo in the High Court of Justice, Chancery Division, in London, England, for the non-payment of principal, interest and default interest due and owing in the amount of $22,457,273.62, plus interest and costs. *See* Writ at 10–11. On that date, NUFI served by hand a copy of the Writ and Statement of Claim upon the Law Debenture Corporation p.1.c. (located in London), which the Congo had designated as its agent in England for service of process under Section 8.6(b) of the Agreement. Hardy Aff. at ¶¶ 2–3, Exh. B. to Rocher Aff; Agreement § 8.6(b), App. 1. The Agreement states that the Congo's appointment of its agent in England for service of process is "irrevocable." *Id.* On July 15, 1987, NUFI also sent a copy of the Writ and Statement of Claim to the Congo by registered air mail, postage prepaid, pursuant to Section 8.6(c) of the Agreement. Hardy Aff. at ¶¶ 5–6; Agreement § 8.6(c). A French translation of the documents was enclosed "for the convenience of the Defendant. . . ." Hardy Aff. at ¶ 6.

On July 15, 1987, the Law Debenture Corporation sent a telex to the Ministry of

---

**1.** Defendant moved previously for a stay of these proceedings pending resolution of the Congo's application before the English High Court of Justice, Chancery Division, to set aside the default judgment. On June 9, 1989, the English Court dismissed the Congo's application. Accordingly, the Congo's motion to stay these proceedings is moot.

Finance for the Congo notifying it that the Congo had been served with the Writ. *See* Telex, Exh. C to Rocher Aff. In the telex, the Law Debenture Corporation stated:

> [W]e are apparently named as the agent to accept service of any proceedings in England for the People's Republic of the Congo. We must point out that we were not properly appointed in that capacity and that we accepted the Writ of Summons and are sending this telex only as a matter of courtesy and without any responsibility on our part because we do act in a similar capacity on behalf of the People's Republic of the Congo in other matters entirely unrelated to the Credit Facility Agreement.

*Id.* A copy of this telex was sent to NUFI's representative, Wilde Sapte. *Id.*

The Credit Facility Agreement provided that the Congo "irrevocably undertakes to enter its unconditional appearance within 60 days after the completion of service on the authorized agent as provided in this section." Agreement § 8.6(c). On October 7, 1987, more than eighty days after service of the papers initiating the English action, NUFI applied to the High Court of Justice, Chancery Division, for the entry of a default judgment against the Congo.

On October 7, 1987, NUFI served the Law Debenture Corporation with a summons notifying the Congo that the hearing on the application for a default judgment was scheduled for October 19, 1987. NUFI also served the Law Debenture Corporation with an affidavit in support of the application for a default judgment. Hardy Aff., Oct. 12, 1987 at ¶¶ 2–3 and Hardy Aff., Oct. 16, 1987 at ¶ 3, Exh. E to Rocher Aff. On the same day, NUFI sent a copy of the summons and affidavit to the Congo by registered air mail, postage prepaid. Hardy Aff. of Oct. 16 at ¶ 2. In addition, NUFI sent a telex to the Congo on October 7, 1987, advising the Congo of the October 19 hearing. Hardy Aff. of Oct. 12 at ¶ 2.

On October 13, the Law Debenture Corporation sent a telex to the Congo, reiterating its position that it was not the Congo's agent and that it was sending the telex only as a matter of courtesy. *See* Exh. F

to Rocher Aff. The Law Debenture Corporation informed the Congo of the October 19 hearing and stated that "this matter obviously requires urgent attention to avoid final judgment being entered against the People's Republic of the Congo." *Id.*

On October 19, 1987, at approximately 10:15 a.m., Mr. Rocher, NUFI's solicitor, received a telephone call from Marc Sage, Esq., who stated that he was a lawyer representing the Congo in connection with the NUFI lawsuit. Rocher Aff. of Jan. 4, 1989, ¶ 18. Mr. Sage requested a postponement of the hearing scheduled that morning for 11:30. *Id.* Mr. Sage indicated that he had received notice of the application for a default judgment for the first time that morning and that he was the only English-speaking lawyer available at the Caisse Congolaise D'Amortissement ("CCA"). He further stated that he had not had time to retain counsel in England to oppose the application. *See* Sage Aff. at ¶ 6. He stated that the Congo requested that the hearing be postponed because the government officials responsible for the matter had understood that settlement negotiations would take place, and that no immediate action would be taken in these legal proceedings. He explained to Mr. Rocher that the Congo had received a telex from Meridien on October 7 that appeared to indicate that an effort would be made to reschedule the debt without resort to further legal action. *Id.* at ¶ 7 (referring to Telex, Exh. C to Sage Aff.).

Mr. Rocher told Mr. Sage that he had no authority to grant or agree to an extension, but he agreed to notify the High Court of Justice of the Congo's request and of his conversation with Mr. Sage. Rocher Aff. at ¶ 18.

At the hearing later that morning before Master Gowers of the High Court of Justice, NUFI's barrister, Mr. Geoffrey Vos, informed the Court that a Congo representative had called and handed the Court a memorandum that Mr. Rocher had prepared, detailing the contents of the call. Vos Declaration ("Decl.") at ¶ 9; *see* Rocher Memo, Exh. G to Rocher Aff. That memorandum expressly stated that Mr.

Sage had stated that the parties had agreed in September to find an amicable solution, and that further settlement discussions would take place in two weeks. Master Gowers of the Court entered the following Minute in his book:

> Counsel informed the Court that at 10:15 am his solicitors received over the telephone from a representative of the Defendant speaking from the Congo a statement which the Defendant desired the solicitors to have relaid to the Court. The Court takes note that the solicitor has through counsel brought to the attention of the Court that statement and invited the Court to note its content. The Court rules that in this commercial matter, the Defendant must if it desires it [sic] representations to be received by the Court lodge as any other litigant an Acknowledgement of Service and must similarly makes [sic] it [sic] representation through in the case of an unincorporated body a solicitor of Counsel; accordingly the Court declines to see the statement.

Minute of Master Gowers, Exh. H to Rocher Aff. Master Gowers told Mr. Vos that he had read the affidavits and exhibits in the court file. Vos. Decl. at ¶ 14. The Court ordered the Congo to pay NUFI $22,457,273.62 plus interest and costs. *Id.* The Court formally entered judgment on October 23, 1987. *See* Exh. J to Rocher Aff.

## DISCUSSION

### A. Jurisdiction

■ The Foreign Sovereign Immunities Act (the "FSIA") grants federal district courts subject matter jurisdiction over certain actions against foreign sovereigns. 28 U.S.C. § 1330(a). Section 1330(a) specifically provides that this Court has jurisdiction "of any nonjury civil action against a foreign state ... with respect to which the state is not entitled to immunity...." Section 1605(a)(1) provides that a sovereign is not immune in any case "in which the foreign state has waived its immunity either explicitly or by implication...."

The Congo admits that it is a foreign sovereign. Answer at ¶ 3. This is a nonjury civil action. The Congo waived sovereign immunity pursuant to § 8.8(b) of the Agreement, which provides:

> To the extent that the [Congo] may be or become entitled, in any jurisdiction in which proceedings may at any time be commenced with respect to any Agreement, to claim for itself or any Government Property located outside of the Congo, sovereign immunity from suit [or] from the jurisdiction of any court, ... and to the extent that in any such jurisdiction there may be attributed such a sovereign immunity (whether or not claimed), the [Congo] (for itself, and for all such Government Property), hereby irrevocably agrees not to claim and hereby irrevocably waives such sovereign immunity in respect of suit [and] jurisdiction of any court.

In a recent Second Circuit case, *Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.*, 760 F.2d 390 (2d Cir.1985), the court held that a similar contractual provision constituted a waiver of sovereign immunity and vested the district court with subject matter jurisdiction under § 1605(a)(1). The court there stated that "[where, as here, a jurisdictional statute is invoked under circumstances consistent with Article III judicial power, federal courts have a 'virtually unflagging obligation ... to exercise the jurisdiction given them.'" *Id.* at 394 (citations omitted). The Congo has not disputed that it waived its sovereign immunity, and the Court finds that it has subject matter jurisdiction.

### B. Recognition of the Default Judgment

The Congo asserts three bases for its opposition to recognition of the default judgment: (1) that NUFI did not properly follow English procedure in serving notice of NUFI's application for a default judgment against the Congo; (2) that NUFI worked a "constructive fraud" upon the Congo in failing to adequately apprise the High Court of Justice of the Congo's desire for a postponement of the hearing; and (3) that recognition of the English judgment awarding damages resulting from the Con-

go's failure to repay a loan would be contrary to principles of equity and international law.[2] All of these objections are unavailing.

### (1) *Notice*
#### (a) Service Upon the London Debenture Corporation

█ Section 12(6) of the English State Immunity Act of 1978 provides that service of process upon a foreign state may be accomplished "in any manner to which the State has agreed." In the Credit Facility Agreement, the Congo had appointed the Law Debenture Corporation as the Congo's "duly authorized agent to receive on its behalf service of all process in any proceedings in the courts of England...." Agreement § 8.6(b), App. 1. The appointment was irrevocable. *Id.* NUFI duly served the Law Debenture Corporation with both the Writ and Statement of Claim on July 15, 1987 and with notice of hearing on the default judgment on October 7, 1987.

The Congo argues that, once Wilde Sapte was informed of the London Debenture Corporation's position that it had not properly been appointed agent for the Congo, the "apparent authority" of the Law Debenture Corporation to accept service on behalf of the Congo was terminated. The Congo's "apparent authority" analysis is inapplicable here. The Congo's appointment of the London Debenture Corporation as its agent was explicit and "irrevocable," according to the terms of the Credit Facility Agreement. *Id.* As NUFI points out, the risk of any disruption in the agent relationship in the circumstances of this case should be borne by the Congo, and not by NUFI, which was directed by the terms of the Agreement to serve the London Debenture Corporation. The English Rules regarding service of a writ provide:

> Where ... the Contract provides that, in the event of any action in respect of the contract being begun, the process by which it is begun may be served on the defendant, or on such other person on his behalf as may be specified in the contract, in such manner, or at such place ... as may be so specified, then, if any action in respect of the contract is begun in the High Court and the writ by which it is begun *is served in accordance with the contract*, the writ shall ... be deemed to have been duly served on the defendant.

Rules of the Supreme Court of England and Wales, Order 10, Rule 3, App. 1 to Plaintiff's Reply Memorandum (emphasis added).

Plaintiff served defendant in accordance with the terms of the Credit Facility Agreement and precisely in the "manner to which the State [had] agreed." Section 12(6) of the English State Immunity Act of 1978. It is uncontroverted, moreover, that the London Debenture Corporation *did* notify the Congo, both of the original Writ and Statement of Claim received July 15, 1987, and of the October 19 hearing. Notice of the hearing was transmitted to the Congo on October 13, six days before the hearing was to take place.

#### (b) Additional Notice Provided to the Congo

█ In addition to serving the Congo's agent, NUFI notified the Congo directly of the proceedings against it, both in July and prior to the October 19 hearing. In July, notice of the proceedings was provided in French; in October, notice was provided in English, both by mail and by telex. The Congo argues that delays in receiving documents, coupled with delays in translating English documents into French, resulted in the Congo's having only four hours' actual notice of the October 19 hearing.

As NUFI points out, however, there was no requirement in the Credit Facility Agreement that documents be provided to the Congo in French. The Agreement is in English, and provides for the use of English-speaking forums (England or the United States). Marc Sage, attorney for the Congo, speaks English fluently. Sage Aff.

---

**2.** The Congo's arguments are based on CPLR § 5304, which provides grounds for non-recognition of a foreign judgment.

at ¶ 2.  Notice in English was adequate and proper.

### (c) The Congo's Failure to Respond to the July 15 Summons

■ The Congo was informed, when it was originally served, that a failure to appear within 60 days could lead to default. The original Writ and Statement of Claim, served directly on the Congo on July 15, 1987, with a French translation, included the following language:

> If you fail to satisfy the claim or to return the Acknowledgement [of Service] within the time stated, or if you return the Acknowledgment without stating therein an intention to contest the proceedings, the Plaintiff may proceed with the action and judgment may be entered against you forthwith without further notice.

Writ at 1, Exh. A to Rocher Aff.

These documents arrived at the Congo's designated governmental body, the CCA, on July 26, 1987.  *See* Congo's Response to NUFI's Interrogatories at 1, App. 3 to NUFI's Reply Mem.  On or about that same day, they were received by Theodore Louhoungou, at that time the Acting Director of the CCA.  *Id.* at 2–3.  Emile Mabonzo, then the Director of the Debt at the CCA and now the General Director, received the documents from Mr. Louhoungou shortly thereafter.  *Id.*  Gregoire Bella, then the General Director of the CCA, also received the documents.  *Id.* at 3.  Mr. Sage, the Congo's lawyer, testified that to the best of his knowledge the Congo received the papers at the "end of July." Sage Depo. at 65, App. 2 to NUFI's Reply Memorandum.

Despite having received the papers, the Congo acknowledges that it did not complete the Acknowledgement of Service form.  Defendant's Mem. at 22 n. 20.  Nonetheless, it suggests that NUFI wrongly sought default judgment when it had "full knowledge that the Congo intended to defend the action." *Id.* at 23.  The Congo argues that its intention to defend was made clear on September 30, 1987, on which date Mr. Bella had settlement negotiations with representatives of NUFI and Meridien; the Congo claims that Mr. Bella told the representatives that the Congo would retain counsel to defend the lawsuit "if necessary." *See* Bella Aff. at ¶ 4 and Exh. A to Bella Aff.  The precise content of the September 30 conversation is a matter of some dispute between the parties.[3]

---

**3.** According to Mr. Salinger, NUFI's representative in settlement discussions, the Congo representative told him on September 30 that "they had been aware of the lawsuit for approximately sixty days and that they had retained counsel to defend the Congo."  Salinger Aff. at ¶ 2.  According to Mr. Bella, however:

> It was agreed at the meeting that steps should be taken to structure an acceptable repayment schedule, in order to avoid proceeding with the lawsuit in England.  I indicated that although the Congo had not responded to that lawsuit, *we would retain counsel and defend our position if necessary.*  I understood from Mr. Salinger that such negotiations would obviate the need for further legal action by NUFI. . . .

Bella Aff. at ¶ 4 (emphasis added).  According to Mr. Salinger, however:

> During the meeting, I expressed to the Congolese representatives a willingness to resolve amicably the litigation initiated by NUFI against the Congo in the High Court of Justice in London, England on July 15, 1987.  At no time during our meeting did [Meridien representative] Mr. Teppema or I represent to the Congo (a) that it need not take any action with respect to the London action, (b) that

NUFI would not make an application to have a default judgment entered against the Congo in the London action, (c) that NUFI would stay, postpone, adjourn or in any way slow down the London proceedings pending the outcome of negotiations between NUFI and the Congo, (d) that NUFI would voluntarily dismiss the London lawsuit, (e) that NUFI would waive the requirement under the Credit Facility Agreement . . . that the Congo must enter an appearance within 60 days after service upon its designated agent, or (f) that NUFI would waive the requirement under English rules of court that the Congo must timely return an Acknowledgement of Service to the High Court of Justice in London.

Saligner Supplemental Aff. at ¶ 2.  It is not necessary to determine which of these conflicting contentions is correct, because the Congo was already in default by the time these discussions took place.  *See* p. 943, *infra.*

Following the September 30 meeting, Meridien sent a telex to the Congo that stated that: [W]e agree with you entirely that it is in the best interest of all concerned parties to adopt urgent measures in order to prevent the legal proceedings . . . from continuing any further. . . .

The informal negotiations with NUFI on September 30 and Mr. Bella's representation that the Congo either had retained or would if necessary retain counsel to defend the lawsuit did not take place until *after* the Congo was in default. According to the explicit terms of the Agreement, NUFI "irrevocably undertakes to enter its unconditional appearance within 60 days after the completion of service on the authorized agent as provided in this section." Section 8.6(c), App. 1. The Congo's authorized agent, the London Debenture Corporation, was served on July 15; the sixty day period thus expired on September 13.[4] Moreover, any belated informal indication of an intention to defend did not comply with the English Rules that, as the Congo concedes, required completion of the form for Acknowledgement of Service.

### (2) *Constructive Fraud*

■ NUFI argues further that the default judgment should be set aside because the English Court was "misled" with respect to the Congo's attempt to obtain an adjournment of the hearing. Essentially, the Congo takes the position that NUFI did not do enough to communicate defendant's desire for an adjournment to the Court.

The Congo maintains that, as a result of the telephone conversation between Marc Sage and Philip Rocher, "Mr. Sage necessarily reposed his confidence in Mr. Rocher, and abandoned further efforts to adjourn the hearing." Defendant's Memorandum at 31. Defendant argues further that NUFI's counsel should have communicated the Congo's desire for an adjournment orally, rather than in writing. Furthermore, while conceding that there is no evidence that NUFI intended to deceive the Court or the Congo, the Congo argues that it relied on NUFI to communicate certain facts to the Court, and it asserts that "the term 'constructive fraud' connotes that in certain circumstances one may be charged with the consequences of his acts, as though he had acted fraudulently, even though his actions were not intentionally deceptive." Defendant's Memorandum at 33. The Congo argues that NUFI's actions had the "ultimate effect" of misleading both the Court and the Congo.

A party must do more than merely assert fraud in order to have a foreign judgment set aside. As the Second Circuit explained in *Clarkson Co. v. Shaheen*, 544 F.2d 624, 631 (2d Cir.1976),

> a foreign judgment may not be collaterally attacked ... upon a mere assertion of fraud. Clear and convincing evidence of fraud is required in order successfully to attack a foreign judgment, just as such proof is necessary before a court will set aside its own judgment.

There is simply no evidence in this case that NUFI misled the Court or the Congo, intentionally or otherwise. Rather, Mr. Vos, the barrister representing NUFI, told the master he had received a call from a Congo representative and then handed Master Gowers the memorandum prepared by Mr. Rocher which set forth the contents of the Rocher–Sage telephone conversation. It was Master Gowers' decision not to consider that memorandum, and that decision cannot be attributed to NUFI. Ultimately, the Congo's argument with respect to fraud depends on the proposition that NUFI had a duty to affirmatively advocate an adjournment. NUFI, however, never represented to Mr. Sage that it would do

Nonetheless, in order to arrive at a position where you could agree to any such arrangement, it is our opinion that the Agreement of the Club of London with respect to the total exclusion of the forest credit for rescheduling must be a condition precedent to any such arrangement.

Exh. A to Bella Aff. Ultimately, of course, no rescheduling agreement was reached by the parties, and NUFI proceeded to obtain a default judgment against the Congo.

4. Papers were also served on the CCA on July 15 and arrived July 26; even if the Court were to use the later date as the date of "completion of service," the time period would have expired on September 24. The Court notes that, even if settlement negotiations had occurred prior to the Congo being in default, entering into informal settlement negotiations does not relieve a party from answering or otherwise defending an action. *See Richardson Greenshields Secs., Inc. v. International Petroleum Corp.*, No. 84–2680, slip op. at 6, 1985 WL 480 (S.D.N.Y. April 8, 1985) (LEXIS, genfed library, Dist file).

this, and Mr. Rocher explicitly informed Mr. Sage that he was not in a position to grant *or agree to* an extension. By simply communicating the Congo's position to the Court, as Mr. Rocher had agreed to do, NUFI fulfilled any obligation it may have had with respect to the adjournment.

### (3) *Policy Considerations*

■ The Congo argues, finally, that policy considerations dictate that this Court not enforce the default judgment against it, because such a judgment would interfere with the Congo's "London Club Agreement," an agreement with commercial bank creditors that provides for rescheduling of the Congo's external debt. This Agreement was entered into on February 26, 1988, after two years of negotiations. Sage Supplemental Decl. at ¶ 3. NUFI was the only creditor to refuse to participate in the rescheduling.

This Court will recognize and enforce the default judgment despite the existence of the London Club Agreement. Participation in international debt rescheduling agreements is voluntary; foreign governments may not unilaterally impose international debt restructuring agreements on unwilling private creditors. *Allied Bank Int'l v. Banco Credito Agricola,* 757 F.2d 516, 519 (2d Cir.), *cert. dismissed,* 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985). Indeed, even when parties *agree* to renegotiate conditions of payment, "the underlying obligations to pay nevertheless remain valid and enforceable." *Id.* If this Court were to refuse to enforce this default judgment on the ground that to do so would interfere with the Congo making payments pursuant to a debt rescheduling agreement entered into with other creditors, it would have the effect of depriving a creditor of its right to choose whether to reschedule a debt or to enforce the underlying obligation to pay. Such a result would be contrary to United States policy as articulated in *Allied Bank,* 757 F.2d at 519.[5]

The Congo also argues that NUFI has "never sought to enforce its 'legitimate rights' under the Agreement," but rather sought "only to disrupt the Congo's international trade and banking business in an effort to obtain for itself preferential refinancing terms." Defendant's Memorandum at 38–39 (footnote omitted). The only support the Congo cites for that argument is a letter from John J. Salinger, president of American International Group, Inc. ("AIG"), of which NUFI is a subsidiary, that begins by noting the fact that consummation of the London Club Agreement would have the adverse effect on NUFI of preventing the Congo from "concluding any arrangement" with NUFI (presumably referring to repayment outside of the London Club Agreement) unless equally favorable offers were made to other commercial lenders. Salinger Letter of Oct. 1, 1987, Exh. G to Sage Aff. The letter goes on to state that if NUFI obtains a default judgment against the Congo, NUFI will, "absent an alternative resolution to the problem," seek to attach assets of the Congo. *Id.* The letter goes on to state:

> Although chances of success of this strategy are unclear, it will certainly serve to disrupt attempts to complete the rescheduling effort and will definitely have an adverse effect on Congo's international trade and banking business. Although we would prefer to avoid this situation, it is clearly a viable, and rational strategy.

*Id.* The mere recognition by a lender that enforcement of its contractual rights may have adverse effects upon a borrower (which in turn could be expected to place

---

**5.** In a sur-reply filed with the Court on April 25, 1989, the Congo argues that "a recent change in United States policy regarding international debt," announced March 10, 1989 by Secretary of the Treasury Nicholas F. Brady in an address to the Brookings Institution and the Bretton Woods Committee, "calls into question the continuing validity of the Second Circuit decision in *Allied Bank....*" Defendant's Letter to the Court, April 25, 1989 at 1–2.

In fact, in Secretary Brady's address, he stated that "we should encourage debt and debt service reduction *on a voluntary basis,* while recognizing the importance of continued new lending." Brady Address at 4, Exh. 1 to Plaintiff's May 1, 1989 Letter to the Court (emphasis added). The Court fails to see how such a position calls into question the continuing validity of *Allied Bank.*

pressure on the borrower to comply with its contractual duties) does not render enforcement of its contractual rights "illegitimate." *See A.I. Credit Corporation v. the Government of Jamaica*, 666 F.Supp. 629, 633 (S.D.N.Y.1987) ("[i]t cannot be said that [the creditor] breached any covenant of good faith and fair dealing that may exist in attempting to enforce legal rights plainly belonging to it under the clear terms of the arms length contract entered into by the parties").

The Court is mindful of the fact that enforcement of this default judgment is likely to cause financial difficulties for the Congo. Judge Sand faced a similar situation in the *A.I. Credit* case, which, like the action at bar, involved a creditor that refused to reschedule foreign debt despite the financial difficulties faced by the foreign debtor. Plaintiff in that case sought to enforce its rights under a 1984 debt rescheduling agreement and refused to take part in subsequent rescheduling agreements entered into between Jamaica and other creditors. Judge Sand noted:

> We have been advised by defendant that our holding could have a devastating financial impact on the Government of Jamaica due to the sharing and default provisions contained in the 1984 and 1987 Agreements. But it is not the function of a federal district court in an action such as this to evaluate the consequences to the debtor of its inability to pay nor the foreign policy or other repercussions of Jamaica's default. Such considerations are properly the concern of other governmental institutions.

*Id.* at 633. The Court there granted summary judgment on behalf of the creditor, enforcing the terms of the 1984 Agreement.

This Court is not the appropriate government institution to weigh the harm to the Congo of paying a valid judgment, against the harm to an insurer (including its shareholders, and, ultimately, other policy holders) that would flow from its being denied its legal right to enforcement of the judgment. No material issue of fact exists for trial, and recognition and enforcement of the default judgment obtained in Great Britain is appropriate.

### CONCLUSION

Plaintiff's motion for summary judgment is granted; defendant's cross-motion for summary judgment is denied. It is hereby

ORDERED that the judgment entered on October 23, 1987 in favor of NUFI and against the Congo by the High Court of Justice, Chancery Division, in London, England is recognized by this Court and further

ORDERED that the Congo pay NUFI the amount of twenty-two million, four hundred fifty-seven thousand, two hundred seventy-three dollars and sixty-two cents ($22,457,273.62), with interest. SO ORDERED.