PRAVIN BANKER ASSOCIATES, LTD., Plaintiff,

v.

BANCO POPULAR del PERU and The Republic of Peru, Defendants.

No. 93 Civ. 0094 (RWS).

United States District Court, S.D. New York.

Feb. 24, 1994.

Winthrop, Stimson, Putnam & Roberts, (John F. Pritchard and Valerie Fitch, of counsel), New York City, for plaintiff.

Baker & Hostetler (Mark A. Cymrot and Jean H. Baker, of counsel), Washington, DC, for defendants.

## OPINION

SWEET, District Judge.

Plaintiff Pravin Banker Associates, Ltd. ("Pravin") moves for summary judgment, pursuant to Rule 56, Fed.R.Civ.P., against Banco Popular del Peru ("Banco Popular") and the Republic of Peru ("Peru") (collectively, the "Defendants"). Banco Popular and Peru have crossed-moved to dismiss or stay Banker's motion for summary judgment, or in the alternative, the Defendants request that the Court deny Pravin's motion for summary judgment on the grounds that it failed to prove essential elements of its claim and the Court should provide Defendants with adequate time for discovery, pursuant to Rule 56(f), Fed.R.Civ.P.

For the reasons set forth below, Pravin's motion for summary judgment will be adjourned for six months as will the Defendants' cross motions to dismiss or stay the action.

### The Parties

Plaintiff Pravin is a Delaware corporation with its principal place of business located in New York, New York.

Defendant Banco Popular is a Peruvian state entity organized and incorporated under the laws of Peru and is a foreign state agency or instrumentality as defined in 28 U.S.C. § 1603(b).

Defendant Peru is a foreign state as defined in 28 U.S.C. § 1603(a).

## Prior Proceedings and Facts

### I. Peru's Economic Woes

In August, 1982, Mexico pronounced it could not service its foreign debt obligations, an event which triggered a foreign debt crisis affecting many countries in South America, Africa, and Asia. In response, many leading financial institutions aborted their traditional lending patterns and, as a result, many impoverished countries, including Peru, are still trying to resolve their economic woes.

In March 1983, Peru determined that it too had insufficient foreign exchange reserves to service its foreign debt. In an effort to resolve its illiquidity crisis, Peru negotiated with the Bank Advisory Committee for Peru—a committee consisting of representatives of Peru's major commercial lenders and chaired by Citibank, N.A.—certain foreign exchange controls limiting the ability of privately as well as publicly owned companies and banks, like Banco Popular, to repay debt on foreign currency loans.

These negotiations yielded a series of agreements, perfected on May 31, 1983, which divided Peru's debt into three categories: (a) short term trade related debt; (b) short term working capital debt; and (c) medium term debt. Nearly two hundred financial institutions entered into a Credit Agreement with Peru which addressed the medium term debt.[1]

Founded in 1899, Banco Popular was a private entity until purchased by the Government of Peru in 1970. As a state owned entity, Banco Popular provided loans and credits to public and private companies and individuals in Peru. It borrowed funds for these purposes from foreign financial institutions. As of May 1983, Banco Popular had borrowed $138,024,183.20 from forty-eight foreign financial institutions. On March 7, 1983, Banco Popular had more than thirty separate short term working capital loans outstanding from Mellon Bank, N.A. ("Mellon") totalling $14,217,788.64.

A separate round of negotiations between the Advisory Committee and Peru failed to yield an agreement, and by 1984, Peru imposed a new series of restrictions on the payment of foreign exchange in order to prevent the depletion of its external reserves. As a result, Banco Popular was unable to repay principal on the Mellon Letter Agreement and thereafter limited itself to only making interest payments on the debt, a practice which continued through February 1992.

Thus, from 1984 through 1990, Peru was generally isolated from the international financial community as it had failed to maintain good standing with the International Monetary Fund ("IMF") and had fallen into arrears on its payments to various multinational organizations, such as the World Bank, the IMF and the Inter–American Development Bank, its bilateral debt agreements with foreign countries, including the United States, as well as with its other foreign commercial lenders and suppliers.

On March 10, 1989, the United States Secretary of the Treasury, Nicholas Brady, revised the United States policy on international debt in what was later to become known as the Brady Plan. Previously, American policy, in what was known as the Baker Plan, had called for the extension of additional commercial credit to resolve the debt crisis. The Brady Plan, on the other hand, recognized that this new credit had not been forthcoming and that poor countries probably would never be in a position to repay the full amount of their foreign debt. Accordingly, the Brady Plan called for a variety of new responses, including a call upon commercial bank creditors to voluntarily reduce outstanding debt obligations owed by poor countries.

Notwithstanding this policy initiative, late in 1989, Peru's commercial lenders, worried that the statute of limitations would expire on their Peruvian claims without a negotiated tolling agreement through the Bank Advisory Committee, filed a series of law suits in as

---

**1.** The Banco Popular debt at issue here was short term working capital debt, and is debt of a public sector entity outstanding as of March 7, 1983, with a maturity date within one year of that date.

The terms of the settlement were outlined in a series of Letter Agreements, guaranteed by the Peruvian government.

many as five countries to preserve their legal claims.[2]

By 1990, Peru's economic status had deteriorated. The Peruvian debt had mounted to $22 billion, much of it in arrears. Hyperinflation had accumulated at a rate of 2 million percent in the previous five years, the Gross Domestic Product had fallen by 25 percent in the previous two years; and thirty percent of the nation's population lived in poverty, of which seven million earned less than $360 a year.

In July 1990, President Alberto Fujimori was elected. President Fujimori introduced dramatic changes into the Peruvian economy referred to in the press as "Fuji Shock." A major element of his reforms was an initiative to reinsert Peru into the international financial community and to comply with various IMF policies.

On October 25, 1990, Peru signed an agreement with the Bank Advisory Committee to stay the pending lawsuits in order to enter into negotiations. At that time, Mellon also agreed to ask the Court to stay its lawsuit against Banco Popular and Peru. On March 30, 1991, Peru and the Bank Advisory Committee agreed to continue to stay the pending lawsuits as long as none of the suits went forward, in exchange for Peru's continued efforts to achieve fiscally sound economic policies. Mellon participated in these meetings and the agreement.[3]

In September 1991, Peru and the IMF entered into an agreement which fundamentally restructured the Peruvian economy, including: a Stabilization Program to reduce inflation and replenish Peru's foreign reserves; a Structural Reform Program ("SRP") to reduce the size of the public sector; a Re–Insertion Program, in effort to eliminate Peru's foreign debt arrears; a reduction in the government deficit, with the consequent firing of thousands of public sector employees; and the privatization of many of the state-owned enterprises.

By November, 1992, Peru's Minister of Economy, in a meeting with the Bank Advisory Committee, could report positive economic results, as exemplified by an inflation rate which is constrained to five percent per month. Peru had also started to receive new multilateral funding from the World Bank and the Inter–Development Bank and bilateral credit financing from various countries, including the United States.

## II. *The Mellon Assignment to Pravin*

Pravin alleges that on December 10 and 12, 1990, it purchased, through the assignment of debt, Mellon's interest in $9,429,-710.38 in working capital obligations of Banco Popular.[4] By December 12, 1990, Pravin had resold much of this debt and kept only $1,425,000.[5]

The price of Pravin's purchases of Mellon's interest on December, 1990, appears to have been 27 cents on the dollar. The price of the subsequent resales were undisclosed. As of July 12, 1993, Peru's foreign debt was selling at approximately 34 cents on the dollar. Pinto Decl. at ¶ 22. As recently as September 13, 1993, the secondary market prices of bank loans to less developed countries per dollar of face value as compiled by Merrill Lynch, Pierce, Fenner & Smith was recorded at ranging from 43¾ to 44 cents on the dollar. Def.'s Ex. 17, *LDC Debt Rep't*, Sept. 13, 1993 at 3.

Pravin alleges that on August 12, 1991, it entered into an agreement with Banco Popular extending the Mellon debt's repayment date to February 1, 1992. Banco Popular, by

---

**2.** Thirteen lawsuits were filed in the Southern District of New York alone.

**3.** Pravin argues that the restructuring negotiations involve only Peru's syndicated bank debt for which Citibank is an agent, and that these negotiations are inapplicable to it as the Mellon notes are two party agreements for which Citibank is not an agent.

**4.** Pravin purchased performing working capital debt which has a higher price than the medium and long-term, non-performing debt, Pravin's debt was considered to be performing because Banco Popular was paying interest.

**5.** During the 1980's, a secondary market developed for the trading of foreign debt instruments of poor countries, including Peru. In this market, banks and other financial institutions purchased and sold debt instruments at less than face value.

contrast, claims it is unaware of this purported agreement. No evidence has been submitted as to whether Peru, as guarantor, was notified or agreed to the alleged Agreement of August, 1991.

Pravin alleges that on February 4, 1992, it made a demand on Banco Popular for payment of the principal amount of the $1,425,-000 and unpaid interest pursuant to the May 1983 Letter Agreement with Mellon. On February 24 and 28, 1992, Pravin sent Banco Popular a Declaration of Default, although no notice of default was given to Peru as guarantor.

### III. *Banco Popular Liquidation Procedure*

Meanwhile, as part of President Fujimori's reforms, Peru established a Commission de la Inversion Privada ("COPRI") to organize and administer the privatization of state-owned entities. On February 15, 1992, CO-PRI appointed a committee for the privatization of Banco Popular, and on October 10, 1992, that committee announced that Banco Popular would be publicly auctioned and that the foreign debt could be used as part of the consideration. Both the offerings of November 3 and 24, 1992 failed for lack of public bids.

On December 1, 1992, the Superintendencia de Banco y Seguros (the Superintendent of Banks) determined that Banco Popular should be dissolved and its assets liquidated, since Banco Popular had failed to maintain the minimum liquidity required by law and had failed to pay its creditors.[6] On December 3, 1992, Peru's central bank appointed a committee of liquidators to administer the dissolution procedures, including the collection and liquidation of assets; claims procedures and priorities of payments, which provided for a method of identifying creditors, including public notice;[7] an opportunity for creditors to make claims;[8] a period for the liquidators to evaluate claims; the public announcement of decisions about claims; and finally the establishment of an appeal procedure in the Peruvian court system.

Although informed of these procedure, Pravin has not participated in the process. On February 1, 1993, Pravin filed this action and has declined to join the procedure established by the IMF for the resolution of its claims. Pravin may still present its claims to the Special Representative for the "second list" of non-declared creditors who have not yet submitted their claims.

According to Defendants, the Bank Advisory Committee has repeatedly expressed its concern to Peru about this action in light of the March 1991 agreement which stated that lawsuits would remain suspended as long as all are suspended. The Bank Advisory Committee has stated that if this lawsuit goes forward all other lawsuits would be reactivated. The Defendants contend that the ensuing creditor stampede to find and attach Peru's overseas assets would both seriously disrupt Peru's foreign trade and undermine its attempts at massive economic structural reform consistent with the IMF's recommendations.

The present motions were argued on September 22, 1993, and the motions were considered fully submitted on that date.

### *Discussion*

The payment of debts is necessary for social order. The non-payment is quite equally necessary for social order. For centuries humanity has oscillated, serenely

---

6. The Superintendent was able to do so pursuant to Peruvian Legislative Decree number 637, dated April 25, 1991, which established a procedure for the dissolution and liquidation of banks and financial institutions declared insolvent by the Superintendent.

7. On December 11, 1992, Notice No. 001 and No. 002 were published in *El Peruano* notifying all creditors to present their claims to Banco Popular by February 12, 1993. In addition, direct notices to foreign creditors were issued by Banco Popular in March of 1993.

8. For creditors who submitted their claims by February of 1992, the Special Representatives prepared a "first list" of creditors specifying the name of the creditor, kind, amount and preference on the credit. Pravin did not present their claims pursuant to this notice. However, banks such as First National Bank of Maryland, Banco Consolidado (Aruba) N.V., Chemical Bank, Swiss Bank Corp., Morgan Stanley Emerging Markets Inc., B.F.G. Bank A.G. and Citibank N.A. all presented their claims to be included on Banco Popular's list of creditors.

unaware, between these two contradictory necessities.[9]

Small debts are like small shot; they are rattling on every side, and can scarcely be escaped without a wound; great debts are like cannon; of loud noise, but little danger.[10]

## I. *The Resolution of this Summary Judgment Motion is Adjourned*

■ Principles of international comity call for the recognition of foreign proceedings to the extent that such proceedings are determined to be orderly, fair and not detrimental to the nation's interests.

International comity is "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895). "[C]omity will be granted to the decision or judgment of a foreign court if it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated." *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457 (2d Cir.1985). As such, " '[c]omity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect.' " *Id.* (quoting *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir.1971), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972)).

· Pursuant to the mechanism established under Peruvian Legislative Decree Number 637, Banco Popular has been dissolved and is in liquidation proceedings. The "true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries." *Canada Southern Ry. v. Gebhard*, 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020 (1883). Further,

"every person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes." *Id.* at 109 U.S. at 537, 3 S.Ct. at 369; *see also Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir.1985).

### A. *Foreign Bankruptcy Proceedings Are Recognized Under Principles of International Comity*

■ Bankruptcy proceedings, such as those under Decree Number 637, are regularly recognized by the courts of the United States as legitimate proceedings directing the dissolution and adjudication of overseas business interests. *See Drexel Burnham Lambert Group Inc. v. Galadari*, 777 F.2d 877, 880 (2d Cir.1985) ("*Galadari*") ("As we have observed only recently, 'American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities.' ") (quoting *Cunard Steamship Co. Ltd. v. Salen Reefer Services AB*, 773 F.2d 452, 458 (2d Cir.1985); *see also, Matter of Colorado Corp.*, 531 F.2d 463 (10th Cir.1976) (granting comity to decrees of Luxembourg and Dutch Antilles courts dissolution of foreign corporate creditors and appointment of liquidators and trustee in bankruptcy); *Zeidenberg v. Polly Peck Int'l PLC*, 91 Civ. 3246, 1992 WL 178626, *3–4, U.S.Dist.LEXIS 10983, **8–11 (S.D.N.Y. July 16, 1992) (dismissing action pending resolution of British bankruptcy proceedings); *DeYoung v. Beddome*, 707 F.Supp. 132, 136 (S.D.N.Y.1989) (dismissing stockholder action on based on notions of international comity extended to Canadian court's approval of acquisition); *Kenner Products Co. v. Societe Fonciere et Financiere Agache–Willot*, 532 F.Supp. 478, 479 (S.D.N.Y.1982) (suspending action as comity requires deference to French bankruptcy proceedings); *Cornfeld v. Investors Overseas Services, Ltd.*, 471 F.Supp. 1255,

---

**9.** Simone Weil (1909–43), "On Bankruptcy" (1937), (Richard Rees *Selected Essays*, ed. 1962).

**10.** Samuel Johnson (1709–84), letter to Joseph Simpson, 1759, quoted in Boswell, *Life of Samuel Johnson* (1791).

1261 (S.D.N.Y.) (dismissing indemnity action under principles of comity to Canadian liquidation proceedings), *aff'd*, 614 F.2d 1286 (2d Cir.1979).

■ Even though a plaintiff in a United States court is an American citizen or entity, principles of comity still encourage deference to foreign bankruptcy proceedings so long as such a foreign proceeding does not result "in injustice" to American citizens or violates the "laws or public policy of the state." *Galadari*, 777 F.2d 877, 880 (quoting *Clarkson Co. v. Shaheen*, 544 F.2d 624, 629 (2d Cir.1976)). A court must consider, however, whether a foreign bankruptcy proceeding "comport[s] with American notions of fairness and due process." *Zeidenberg v. Polly Peck Int'l PLC*, 91 Civ. 3246, 1992 WL 178626, *3, U.S.Dist.LEXIS 10983, *9 (July 16, 1992); *see also, Cunard*, 773 F.2d at 459; *In re Axona Int'l Credit & Commerce Ltd.*, 88 B.R. 597, 610 (Bankr.S.D.N.Y.1988), *aff'd*, 115 B.R. 442 (S.D.N.Y.1990) (holding that although foreign proceedings need not be identical to American bankruptcy proceedings, they must include standards of fundamental fairness).

In *Drexel*, a citizen of Dubai, United Arab Emirates executed a promissory note to Drexel, Burnham, Lambert to cover investment losses. After the investor defaulted, Drexel initiated an action in the Southern District of New York, whereupon the Crown Prince and Deputy Ruler of Dubai issued a decree establishing a Committee of Receivers to manage the investors assets and to oversee the orderly liquidation of his affairs. The Honorable Constance Baker Motley held that absent a showing that the Dubai pro-

ceedings were fraudulent or fundamentally unfair, such liquidation proceedings were entitled to deference by United States courts under principles of internationally comity.[11] On appeal, the Second Circuit remanded the case for an evidentiary hearing as to whether Dubai had established a fair procedure to resolve creditors claims. *Drexel*, 777 F.2d at 881.[12]

### B. *Peru's Liquidation Procedure For Banco Popular Satisfies American Notions of Fundamental Fairness*

■ Pursuant to the IMF's Economic Program, Peru was obligated to reduce its fiscal deficit by privatizing most of its state-owned companies. Beginning in April of 1992, Banco Popular drew upon state funds for its operations and had thus fallen below the minimum amount of liquidity necessary to either maintain compliance with Peruvian law to function as a bank or to pay its creditors. Accordingly, Peru tried to sell the bank at public auction on two separate occasions in November 1992. When no qualified bidders appeared, the Superintendent of Banks determined it was necessary to liquidate Banco Popular.

Peruvian Legislative Decree No. 637 provides an appropriate procedure for the dissolution and liquidation of banks and financial institutions. The Superintendent issued Resolution No. 1332–92–SBS ordering the liquidation of its assets on December 1, 1992. Under the Peruvian system, the equivalent of bankruptcy trustees, known as Special Representatives, have been named to represent and administer Banco Popular's dissolution

11. In *Drexel*, Judge Motley found that:

"Unlike the unilateral foreign expropriations and repudiations of debt which, when beyond the scope of the act of state doctrine, have been accorded little respect in American courts, *Allied Bank [Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516 (2d Cir.1985)]; *Libra Bank [, Ltd. v. Banco Nacional de Costa Rica*, 570 F.Supp. 870 (S.D.N.Y.1983)], the Dubai procedure is consistent with the basic premises and policies of American and British bankruptcy law. Faced with a national crisis over the acute liquidity problems of defendants, Dubai undertook to freeze all debt pay-

ments, centralize the management of defendants' affairs, and effect an orderly liquidation of defendants' assets. Such a procedure is certainly ·not facially unfair ...
*Drexel Burnham Lambert Group, Inc. v. Galadari*, 610 F.Supp. 114, 119 (S.D.N.Y.1985).

12. On remand, the Court determined that the bankruptcy proceeding in Dubai had indeed complied with notions of due process and fairness and accordingly, Galadari was entitled to a stay pending the outcome of the bankruptcy proceedings in Dubai. *Galadari*, No. 84 Civ. 2602, 1987 WL 6164, U.S.Dist.LEXIS 5030 (S.D.N.Y., Jan. 29, 1987).

and liquidation.[13] As in United States bankruptcy proceedings, during liquidation, Banco Popular's assets are not subject to claims, charges or attachments, nor are any advance payments or obligations permitted.

Public notice has been afforded both in Peru and directly to foreign creditors. A "first list" of creditors has been drafted by the Special Representatives. The Special Representatives are now preparing a "second list" of creditors which will include all non-declared creditors who did not submit their claims. Pravin has not stated a basis for refusing to submitting its claim to this list. After publication of the "second list" the Special Representatives will prepare a "third" list indicating all approved and rejected credits, including the preference of credits established by Peruvian law.[14] Notice of the "third list" will subsequently be published in the official newspaper. An appeal mechanism is available whereby a party may seek legal redress in the Peruvian Superior Court, and ultimately may appeal to the Peruvian Supreme Court (although only on procedural grounds).

■ The Peruvian bankruptcy procedures appear to share the central premise of the United State Bankruptcy Codes, which is to seek "equality of distribution of assets among creditors ... and correlatively avoid[ ] preference to some." *Israel–British Bank (London) v. Federal Deposit Ins. Corp.*, 536 F.2d 509, 513 (2d Cir.), *cert. denied*, 429 U.S. 978, 97 S.Ct. 486, 50 L.Ed.2d 585 (1976). The Special Representatives are required by Pe-

ruvian law to seek an orderly and equitable distribution of assets. The procedures as established by the Special Representatives appear to be consistent with American notions of due process and fairness.[15] Accordingly, a delay of six months pending the resolution of Banco Popular's liquidation proceeding seems a reasonable, albeit a temporary, solution.

## II. United States Policy Interests Mandate A Stay of This Action

■ Indeed, Pravin does not attack the Peruvian procedures as unfair, but contends that the United States policy encourages financially distressed countries to renegotiate their private sovereign debt, but in an environment in which lenders have the continuing right to enforce the obligations of the debtor and any guarantor. In short, Pravin argues that law of this Circuit establishes the right of a lender to a foreign government to adjudicate a debt owed pursuant to an agreement between the parties. *See, e.g., Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 519 (2d Cir.1985) (holding that although "parties may agree to renegotiate conditions of payment, the underlying obligations to pay nevertheless remain valid and enforceable."); *Nat'l Union Fire Ins. Co. of Pittsburgh v. People's Rep. of the Congo*, 729 F.Supp. 936, 944 (S.D.N.Y.1989) (holding that: "[p]articipation in international debt rescheduling agreements is voluntary; foreign governments may not unilater-

---

13. Special Representative Miguel Velasco Bosshard is a professional economist and has worked on prior liquidations. Special representative Carlos Nevares Robles is a professional banker with 22 years of banking experience. Jorge Alarcon Revilla is a lawyer, a member of the Lima Bar Board, and has been appointed as a judge substitute. It appears that these individuals are suitably independent and competent to serve as Special Representatives.

14. Pursuant to Article 338 of Legislative Decree Number 637, payments are to be made in the following order: worker salaries; indemnity benefits for workers; taxes; professional fees; deposits, not including deposits made by other national or foreign banks or financial institutions, bond and security funds deposit; all other credits, and secondary bonds.

15. A stay may also be granted against non-bankrupt defendants and guarantors in unusual circumstance in which the debtor and the guarantor are closely related. *Cf. A.H. Robbins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.) (applying courts equitable powers pursuant to § 105 of the Bankruptcy Act to stay action), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); *In re Otero Mills, Inc.*, 25 B.R. 1018 (D.N.M. 1982) (actions against bankrupt's president and guarantor stayed); *In re Lomas Financial Corp.*, 117 B.R. 64 (S.D.N.Y.1990) (granting preliminary injunction granted because reorganization efforts would suffer irreparable harm if suit against officers were permitted); *In re Johns–Manville Corp.*, 33 B.R. 254 (1983), *aff'd*, 40 B.R. 219 (S.D.N.Y.1984) (staying action against debtor' key officers and insurers because such actions would drain assets in debtor's estate).

ally impose international debt restructuring agreements on unwilling private creditors.").

This case is distinguishable from *Allied* and its progeny in two important ways. First, the *Allied* line of cases all concern creditors which chose to opt out of a negotiated settlement between the country and its creditors after the negotiation process had concluded. In this case, however, the negotiations are on-going and a stay in no way abrogates Pravin's ability to enforce its contract rights in the future, especially as Pravin has made no showing of urgency.

Second, in *Allied* and its progeny, the foreign nations and debtors acts were *inconsistent* with U.S. policy. In *Allied*, the Court found the IMF to be an integral component to American foreign debt policy:

> The Justice Department brief gave the following explanation of our government's support for the debt resolution procedure that operates through the auspices of the International Monetary Fund (IMF). Guided by the IMF, this long established approach encourages the cooperative adjustment of international debt problems.

757 F.2d at 516. In this case, sufficient evidence has been presented to indicate that Peru is in compliance with the mandates of U.S. policy. To allow Pravin to activate its claim in this case would be like letting the tail wag the proverbial dog.[16]

 Under principles of international comity, acts of foreign governments which are consistent with United States law and policy may not be reviewed by courts. *See Allied Bank Int'l v. Banco Credito Agricola*, 757 F.2d at 522 (citing *United States v. Belmont*, 301 U.S. 324, 332–33, 57 S.Ct. 758, 761–62, 81 L.Ed. 1134 (1937)). Congress has determined that it is in the United States policy interest to require a debtor country to engage in the IMF's debt resolution procedure and to negotiate debt terms with creditors in accordance with a "country's ability to pay." 22 U.S.C. § 286dd.

In 1988, Congress passed the "International Debt Management Act of 1988" which redefined American policy concerning international debt management.[17] Specifically, Congress enumerated several "findings" indicating that the international debt is considered a problem which "threatens the safety and soundness of the international financial system, the stability of the international trading system, and the economic development of the debtor countries." In addition, Congress found:

> (3) growth in developing countries with substantial external debts has been significantly constrained over the last several years by a combination of high debt service obligations and insufficient new flows of financial resources to these countries.
>
> . . . .
>
> (8) current approaches to the debt problem should not rely solely on new lending as a solution to the debt problem, and should focus on other financing alternatives including a reduction in current debt service obligations;
>
> (9) new international mechanism to improve the management of the debt problem and to expand the range of financing options available to developing countries should be explored; and
>
> (10) industrial countries with strong current account surpluses have a disproportionate share of the world's capital resources, and bear an additional responsibil-

---

**16.** Interesting, the Government's amicus brief which successfully sought the reversal of the Second Circuit's initial decision in *Allied*, predicted just the sort of scenario which Pravin urges upon the court here, i.e. the specter of a "rogue" bank causing economic chaos in a foreign land. *See* U.S. Brief at 17 n. 12.

**17.** The legislative history of this section indicates that both the House and Senate were deeply concerned about the heavy debt burdens and refinancing options faced by poor countries. *See* Conference Report, H.Rep. No. 100–576, at 847

(Apr. 20, 1988) ("The Senate recedes to the House on the regulatory study with an amendment shortening the study to an analysis of regulatory and accounting obstacles to various forms of debt restructuring, including (but not limited to) negotiated interest reduction, amortization of loan losses, securitization and debt conversion techniques, and discounted debt repurchases as well as an analysis of the profitability of commercial bank lending to developing countries during the 10 year period 1976–1086.").

ity for contributing to a viable long-term solution to the debt problem.

22 U.S.C. §§ 5322(1), (8)–(10).

Additionally, the executive branch has revised its prior approach to the debt problem (which called for the additional extension of debt in an effort to stimulate poor countries' economies previously set forth in the Baker Plan) to a more complex approach as advocated by Secretary of Treasury James Brady in what is now known as the Brady Plan. The Brady Plan recognized that multilateral institutions and the Paris Club had supplied the shortfall in financing while commercial bank exposure had declined. Secretary Brady argued that this trend "could lead to a situation in which the debt problem would be transferred largely to the international institutions, weakening their financial positions." See James Brady, "A Reexamination of the Debt Strategy, Third World Debt: The Next Phase (Edward R. Fried & Philip H. Trezise eds. 1989) at 71.

As a solution, Brady proposed that the then prevalent strategy of voluntary debt reduction should be strengthened in the following ways: first, he called for the internal economic restructuring within debtor nations, pursuant to IMF and World Bank programs; second, he argued that the creditor community, including commercial banks should "provide more effective and timely financial support" including commercial banks "negotiation of a general waiver of the sharing and negative pledge clauses for performing debtor country that would permit an orderly process whereby banks that wish to do so can negotiate debt or debt service reduction transactions"; finally the Brady stated that

"timely and flexible financial support" should be extended to cash strapped poor countries. Id. at 72–73.[18]

As central method of internal economic restructuring of debtor nations advocated by the IMF Economic Program is the privatization or liquidation of state-owned banks. See IMF Staff Report for Financing Assurances and Mid–Term Reviews Under the Extended Arrangement, July 19, 1993 at 6–7.[19] In a recent, staff report, the IMF has lauded Peru's attempts to privatize and restructure its economy:

[S]ince 1990 the Peruvian authorities have been engaged in a courageous and far-reaching program of economic adjustment and structural reform. However, as was just noted, continued external assistance, will be needed to support these efforts. The staff regards the policy objectives and measure incorporated in the authorities' program as appropriate and deserving the support of the international financing community, including from the Fund once arrears have been cleared. In line with Fund guidelines and in view of Peru's track record of policy implementation since August, 1990, Peru's performance under the RAP, and the demonstrated willingness and ability of the authorities to respond quickly to developments, the staff will be in a position to recommend support for the authorities' request for an extended arrangement once Peru has cleared its arrears to the Fund.

See IMF Staff Report for the 1992 Article IV Consultation and on Peru's Economic Program for 1993–1995, Jan. 26, 1993 at 16.

---

**18.** The limited record before the court indicates that President Clinton's policy conforms to the Brady Plan's approach and fully endorses Peru's privatization efforts. See Def.Ex. 9, at 1–2, The President's Reply to The Remarks of the Newly Appointed Ambassador of the Republic of Peru Ricardo Luna Mendoza Upon the Occasion of the Presentation of His Letter of Credence ("And because of President Fujimori's sound economic policies and rapprochement with the international financial institutions, Peru is on the verge of reentering the international financial community. Meanwhile, privatization of state-owned enterprises continues apace as Peru steers its course to reinvigoration of the private sector.").

**19.** See also IMF, Staff Report for Financing Assurances and Mid–Term reviews Under the Extended Arrangement, July 19, 1993, at 9 ("The situation of the private banking system is an area of concern and the staff welcomes efforts made by the Superintendency of Banks and Insurance to develop a plan to increase provisioning and capitalization. It is important that this plan be implemented expeditiously. Also, the staff would encourage the authorities to move without delay in the privatization of the remaining commercial banks owned by the Government, and to proceed with the restructuring of the Banco de la Nacion.").

It appears that the IMF is monitoring Peru's economic initiatives with close scrutiny. Peru's 1993 Economic Program, approved by the IMF, provides for negotiations with the Bank Advisory Committee once the pending lawsuits are dismissed. On-going meetings are taking place between the Minister of Economy and Finance and the Bank Advisory Committee. An agreement with the commercial lenders is to be financed utilizing a combination of resources from international institutions, including the IMF, as well as bilateral donors, including the U.S. government and Peru's remaining resources. The fact remains, both Peru's 1993 Economic Program and the Mid–Term Review, conducted by the IMF, found that Peru will only be able to meet complete its economic reforms with the "deferral of payments to foreign commercial creditors." 1993 Economic Program at 11; Mid–Term Review at 16 n. 5.

Although these policy concerns are generally beyond the reach of the Courts, see *A.I. Credit Corp. v. Gov't of Jamaica*, 666 F.Supp. 629, 633 (S.D.N.Y.1987) ("it is not the function of a federal district court ... to evaluate the consequences to the debtor of its inability to pay nor the foreign policy or other repercussion of Jamaica's default."), Peru is actively attempting to conform to the mandates of the IMF. The policies of the IMF, as noted even by the *Allied* court, may be construed to represent American policy interests. Therefore, as there is a paucity of strong policy grounds against the temporary delay in this action, a grant of a six month delay in this case appears to be appropriate.

### Conclusion

For the reasons stated above, Pravin's motion for summary judgment is adjourned for a period of six months. The cross motion for a stay will similarly be adjourned.

It is so ordered.