**ALLIED BANK INTERNATIONAL, For Itself and As Agent For American Fletcher National Bank, American Fletcher Bank (Suisse) A.G., Atlantic International Bank, Banco Exterior De Espana, Banco De Madrid, Bank of Miami, Intercontinental Bank of Miami Beach, Bank of Montreal, Bank of New Orleans, Bank of Virginia International, Bayerische Vereins bank Int'l, S.A., Bayerische Vereins bank, A.G., Bremar Holdings Limited, Cleveland Trust Company, Columbia Union National Bank, Credit Lyonnais, Deutsche Bank A.G., Export-Import Bank of the United States, Federal Deposit Insurance Corp., Fidelity National Bank of South Miami, Fidelity Union Trust Company, First Commercial Bank of Taiwan, First National Bank of Fort Worth, First National City Bank (Interamerica), First Pennsylvania Bank, N.A., Hartford National Bank, International Commercial Bank of China, Irving Inter-American Bank, Irving Trust Company, Kyowa Bank Limited, National Westminster Bank Ltd., Overseas Investors Inc., the Royal Bank of Canada, the Sanwa Bank Limited, Equibank N.A., Southeast First National Bank of Miami, Stockholms Sparbank, and United California Bank, Plaintiffs,**

**Allied Bank International, Plaintiff-Appellant,**

**v.**

**BANCO CREDITO AGRICOLA DE CARTAGO, Banco Anglo Costarricense and Banco Nacional De Costa Rica, Defendants-Appellees.**

No. 225; Docket 83–7714.

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 1984.

Decided March 18, 1985.

Robert B. McKay, New York City (Salvatore A. Ranieri, Michael S. Allen, Santora, McKay & Ranieri, New York City, of counsel), for plaintiff-appellant.

Jeffrey Barist, New York City (James B. Hurlock, Robert M. Kelly, F. Ellen Zeifer, Owen C. Pell, White & Case, New York City, of counsel), for defendants-appellees.

John L. Warden, H. Rodgin Cohen, Michael Straus, Steven H. Reisberg, Sullivan & Cromwell, New York City, for amicus curiae The New York Clearing House Association.

John M. Rogers, Dept. of Justice, Civil Div., Washington, D.C. (Richard K. Willard, Acting Asst. Atty. Gen., Robert E. Kopp, Dept. of Justice, David H. Small, Asst. Legal Adviser for Economic & Business Affairs, Harold G. Maier, Counselor on International Law, James V. Hackney, Jane P. Dana, Attorney-Advisers, Dept. of State, Margery Waxman, Acting Gen. Counsel, Ricki Rhodarmer Tigert, Sr. Counsel for International Finance, Dept. of the Treasury, Michael Bradfield, Gen. Counsel, Nancy P. Jacklin, Asst. Gen. Counsel, Board of Governors of the Federal Reserve System, Washington, D.C., of counsel), for the United States as amicus curiae.

Monroe Leigh, Cecil J. Olmstead, Timothy B. Atkeson, Alice L. Mattice, Steptoe & Johnson, Washington, D.C., for The Rule of Law Committee and The National Foreign Trade Council, Inc. as amici curiae.

Before MESKILL and PIERCE, Circuit Judges, and METZNER,[*] District Judge.

## ON REHEARING

MESKILL, Circuit Judge:

This matter is before us on rehearing. We vacate our previous decision dated April 23, 1984. We reverse the dismissal of the cause by the United States District Court for the Southern District of New York, Griesa, J. We also reverse the district court's denial of plaintiff-appellant Allied Bank International's (Allied) motion for summary judgment. Both district court rulings were predicated solely on the act of state doctrine. Because that doctrine is not applicable, we remand to the district court for entry of summary judgment for Allied.

### I

Allied is the agent for a syndicate of thirty-nine creditor banks. Defendants-appellees are three Costa Rican banks that are wholly owned by the Republic of Costa Rica and subject to the direct control of the Central Bank of Costa Rica (Central Bank). Allied brought this action in February 1982 to recover on promissory notes issued by the Costa Rican banks.[1] The notes, which

---

[*] Honorable Charles M. Metzner, United States District Judge for the Southern District of New York, sitting by designation.

1. The underlying obligations had been assumed by the Costa Rican banks after the failure of the Latin American Bank, a bank doing business principally in Costa Rica, pursuant to that bank's reorganization. The Costa Rican banks issued new promissory notes and executed side letter agreements with the syndicate of creditor banks in 1976.

were in default, were payable in United States dollars in New York City. The parties' agreements acknowledged that the obligations were registered with Central Bank which was supposed to provide the necessary dollars for payment.

The defaults were due solely to actions of the Costa Rican government. In July 1981, in response to escalating national economic problems, Central Bank issued regulations which essentially suspended all external debt payments. In November 1981, the government issued an executive decree which conditioned all payments of external debt on express approval from Central Bank. Central Bank subsequently refused to authorize any foreign debt payments in United States dollars, thus precluding payment on the notes here at issue. In accordance with the provisions of the agreements, Allied accelerated the debt and sued for the full amount of principal and interest outstanding.

The Costa Rican banks moved the district court to dismiss the complaint, claiming lack of subject matter jurisdiction due to sovereign immunity, lack of *in personam* jurisdiction and insufficiency of process and service. Allied moved for summary judgment. The sole defense raised by appellees in response was the act of state doctrine.

The district court denied all of the motions. 566 F.Supp. 1440 (S.D.N.Y.1983). Reasoning that a judicial determination contrary to the Costa Rican directives could embarrass the United States government in its relations with the Costa Rican government, the court held that the act of state doctrine barred entry of summary judgment for Allied.

While the action was still pending before the district court, the parties began to negotiate a rescheduling of the debt. In July 1982, the suit was dismissed by agreement after the parties stipulated that no issues of fact remained with respect to the act of state doctrine issue. In September 1983, appellees, Central Bank and the Republic of Costa Rica signed a refinancing agreement with the coordinating agent for Costa Rica's external creditors. Fidelity Union Trust Company of New Jersey, one of the members of the Allied syndicate, did not accept the agreement. On behalf of Fidelity, the only creditor that refused to participate in the restructuring, Allied has prosecuted this appeal. The refinancing went into effect nonetheless and appellees have been making payments to the remaining thirty-eight members of the syndicate.

## II

In our previous decision, we affirmed the district court's dismissal. We did not address the question of whether the act of state doctrine applied because we determined that the actions of the Costa Rican government which precipitated the default of the Costa Rican banks were fully consistent with the law and policy of the United States. We therefore concluded that principles of comity compelled us to recognize as valid the Costa Rican directives.

Our interpretation of United States policy, however, arose primarily from our belief that the legislative and executive branches of our government fully supported Costa Rica's actions and all of the economic ramifications. On rehearing, the Executive Branch of the United States joined this litigation as *amicus curiae* and respectfully disputed our reasoning. The Justice Department brief gave the following explanation of our government's support for the debt resolution procedure that operates through the auspices of the International Monetary Fund (IMF). Guided by the IMF, this long established approach encourages the cooperative adjustment of international debt problems. The entire strategy is grounded in the understanding that, while parties may agree to renegotiate conditions of payment, the underlying obligations to pay nevertheless remain valid and enforceable. Costa Rica's attempted unilateral restructuring of private obligations, the United States contends, was inconsistent with this system of international cooperation and negotiation and thus inconsistent with United States policy.

The United States government further explains that its position on private international debt is not inconsistent with either its own willingness to restructure Costa Rica's intergovernmental obligations or with continued United States aid to the economically distressed Central American country. Our previous conclusion that the Costa Rican decrees were consistent with United States policy was premised on these two circumstances.

In light of the government's elucidation of its position, we believe that our earlier interpretation of United States policy was wrong. Nevertheless, if, as Judge Griesa held, the act of state doctrine applies, it precludes judicial examination of the Costa Rican decrees. Thus we must first consider that question.

### III

■ The act of state doctrine operates to confer presumptive validity on certain acts of foreign sovereigns by rendering non-justiciable claims that challenge such acts. The judicially created doctrine is not jurisdictional; it is "a rule of decision under which an act meeting the definition ... is binding on the court." Restatement (Revised) of Foreign Relations Law § 428 comment c (Tent. Draft No. 4, 1983); *Empresa Cubana Exportadora de Azucar y Sus Derivados v. Lamborn & Co.*, 652 F.2d 231, 239 (2d Cir.1981). The applicability of the doctrine is purely a matter of federal law. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427, 84 S.Ct. 923, 939, 11 L.Ed.2d 804 (1964).

The classic statement of the doctrine was delivered in *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897):

Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

The modern formulation derives from the Supreme Court's opinion in *Sabbatino*:

[R]ather than laying down or reaffirming an inflexible and all-encompassing rule in this case, we decide only that the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

376 U.S. at 428, 84 S.Ct. at 940. It has always been clear that "[t]he act of state doctrine does not ... bar inquiry by the courts into the validity of extraterritorial takings." *Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*, 658 F.2d 903, 908 (2d Cir.1981); *Republic of Iraq v. First National City Bank*, 353 F.2d 47, 51 (2d Cir.1965), *cert. denied*, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966). It simply "concerns the limits for determining the validity of an otherwise applicable rule of law." *Sabbatino*, 376 U.S. at 438, 84 S.Ct. at 945.

■ Originally linked with principles of sovereign immunity, the act of state doctrine has more recently been described as "aris[ing] out of the basic relationships between branches of government in a system of separation of powers." *Id.* at 423, 84 S.Ct. at 938. The policy concerns underlying the doctrine focus on the preeminence of the political branches, and particularly the executive, in the conduct of foreign policy. *E.g., Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 697, 96 S.Ct. 1854, 1863, 48 L.Ed.2d 301 (1976) (opinion of White, *J.*); *Garcia v. Chase Manhattan Bank, N.A.*, 735 F.2d 645, 651 (2d Cir.1984); *Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d 875, 881–82 (2d Cir.1981). Therefore, the applicability of the doctrine depends on the likely impact on international relations that

would result from judicial consideration of the foreign sovereign's act.[2] If adjudication would embarrass or hinder the executive in the realm of foreign relations, the court should refrain from inquiring into the validity of the foreign state's act. *Sabbatino,* 376 U.S. at 427–28, 431–33, 84 S.Ct. at 939–40, 941–43; *Garcia,* 735 F.2d at 651.

■ The Supreme Court has been quite careful to avoid the creation of "an inflexible and all-encompassing rule" to govern the application of the doctrine; "the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches." *Sabbatino,* 376 U.S. at 428, 84 S.Ct. at 940. The doctrine demands a case-by-case analysis of the extent to which in the context of a particular dispute separation of powers concerns are implicated. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 316 n. 38 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).

This analysis must always be tempered by common sense. *See Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co.,* 392 F.2d 706, 715 (5th Cir.), *cert. denied,* 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968). The doctrine does not necessarily "preclude judicial resolution of all commercial consequences" that result from acts of foreign sovereigns performed within their own borders. *Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371, 1380–81 (5th Cir.1980). But, obviously, where the taking is wholly accomplished within the foreign sovereign's territory, "it would be an affront to such foreign government for courts of the United States to hold that such act was a nullity." *Tabacalera,* 392 F.2d at 715. Furthermore, under such circumstances, the court's decision would almost surely be disregarded within the borders of the foreign state.

■ The extraterritorial limitation, an inevitable conjunct of the foreign policy concerns underlying the doctrine, dictates that our decision herein depends on the situs of the property at the time of the purported taking.[3] The property, of course, is Allied's right to receive repayment from the Costa Rican banks in accordance with the agreements. The act of state doctrine is applicable to this dispute only if, when the decrees were promulgated, the situs of the debts was in Costa Rica. Because we conclude that the situs of the property was in the United States, the doctrine is not applicable.

As the Fifth Circuit explained in *Tabacalera,* the concept of the situs of a debt for act of state purposes differs from the ordinary concept. It depends in large part on whether the purported taking can be said to have "come to complete fruition within the dominion of the [foreign] government." *Tabacalera,* 392 F:2d at 715–16. In this case, Costa Rica could not wholly extinguish the Costa Rican banks' obligation to timely pay United States dollars to Allied in New York. Thus the situs of the debt was not Costa Rica.

The same result obtains under ordinary situs analysis. The Costa Rican banks conceded jurisdiction in New York and they agreed to pay the debt in New York City in United States dollars. Allied, the designated syndicate agent, is located in the United States, specifically in New York; some of the negotiations between the parties took place in the United States. The United States has an interest in maintaining New York's status as one of the foremost commercial centers in the world. Further, New York is the international clearing center for United States dollars. In addition to other international activities, United States banks lend billions of dollars to foreign debtors each year. The United States has an interest in ensuring that creditors

---

**2.** This estimation may be guided but not controlled by the position, if any, articulated by the executive as to the applicability *vel non* of the doctrine to a particular set of facts. Whether to invoke the act of state doctrine is ultimately and always a judicial question.

**3.** It seems clear that if the decrees are given effect and Allied's right to receive payment in accordance with the agreements is thereby extinguished, a "taking" has occurred.

entitled to payment in the United States in United States dollars under contracts subject to the jurisdiction of United States courts may assume that, except under the most extraordinary circumstances, their rights will be determined in accordance with recognized principles of contract law.

In contrast, while Costa Rica has a legitimate concern in overseeing the debt situation of state-owned banks and in maintaining a stable economy, its interest in the contracts at issue is essentially limited to the extent to which it can unilaterally alter the payment terms. Costa Rica's potential jurisdiction over the debt is not sufficient to locate the debt there for the purposes of act of state doctrine analysis. *Cf. United Bank Ltd. v. Cosmic International, Inc.*, 542 F.2d 868, 874 (2d Cir.1976).

Thus, under either analysis, our result is the same: the situs of the debt was in the United States, not in Costa Rica. Consequently, this was not "a taking of property within its own territory by [Costa Rica]." *Sabbatino*, 376 U.S. at 428, 84 S.Ct. at 940. The act of state doctrine is, therefore, inapplicable.

## IV

Acts of foreign governments purporting to have extraterritorial effect—and consequently, by definition, falling outside the scope of the act of state doctrine—should be recognized by the courts only if they are consistent with the law and policy of the United States. *United States v. Belmont*, 301 U.S. 324, 332–33, 57 S.Ct. 758, 761–62, 81 L.Ed. 1134 (1937); *Banco Nacional de Cuba v. Chemical Bank*, 658 F.2d at 908–09; *Republic of Iraq*, 353 F.2d at 51. Thus, we have come full circle to reassess whether we should give effect to the Costa Rican directives. We now conclude that we should not.

The Costa Rican government's unilateral attempt to repudiate private, commercial obligations is inconsistent with the orderly resolution of international debt problems. It is similarly contrary to the interests of the United States, a major source of private international credit. The government has procedures for resolving intergovernmental financial difficulties. *See, e.g.*, Foreign Assistance Act of 1961, Pub.L. No. 87–195, 75 Stat. 424 (1961) (codified as amended in scattered sections of 22 U.S.C.). With respect to private debt, support for the IMF resolution strategy is consistent with both the policy aims and best interests of the United States.

Recognition of the Costa Rican directives in this context would also be counter to principles of contract law. Appellees explicitly agreed that their obligation to pay would not be excused in the event that Central Bank failed to provide the necessary United States dollars for payment. This, of course, was the precise cause of the default. If we were to give effect to the directives, our decision would vitiate an express provision of the contracts between the parties.[4]

The Costa Rican directives are inconsistent with the law and policy of the United States. We refuse, therefore, to hold that the directives excuse the obligations of the Costa Rican banks. The appellees' inability to pay United States dollars relates only to the potential enforceability of the judgment; it does not determine whether judgment should enter. *See Weston Banking*

---

4. Each agreement specifically provided:

7. Events of Default:

If any of the following events of default should occur and is not remedied within a period of 30 days as of the date of occurrence, the Agent Bank may, by a written notice to the Borrower declare the promissory notes to be due and payable. In such an event, they shall be considered to be due without presentment, demand, protest or any other notice to the Borrower, all of which are expressly waived by this agreement:

7.1 Any payment of principal or interest under this transaction shall not have been paid on its maturity date. If the Borrower shall not effect any payment of principal or interest on the promissory notes at maturity, due solely to the omission or refusal by the Central Bank of Costa Rica to provide the necessary U.S. Dollars, such an event shall not be considered to be an event of default which would justify the demandability of the obligation, during a period of 10 days after such maturity date.

*Corp. v. Turkiye Garanti Bankasi A.S.,*
86 A.D.2d 544, 446 N.Y.S.2d 67, 69, *aff'd,*
57 N.Y.2d 315, 442 N.E.2d 1195, 456 N.Y.
S.2d 684 (1982).

### V.

The parties agreed below that no questions of material fact remained as to Allied's motion for summary judgment. The act of state doctrine was the only defense raised by the Costa Rican banks to Allied's motion and the only ground for the district court's denial of that motion. Moreover, the doctrine was the sole basis for the district court's dismissal of the action. We hold today that the act of state doctrine is not applicable to this litigation. Therefore, the district court's rulings cannot stand.

We vacate our previous decision, reverse the district court's denial of Allied's motion for summary judgment and its dismissal of the action and direct the district court to enter judgment for Allied.