ELLIOTT ASSOCIATES, L.P., Plaintiff,

v.

The REPUBLIC OF PERU, Defendant.

ELLIOTT ASSOCIATES, L.P., Plaintiff,

v.

BANCO DE LA NACION, Defendant.

Nos. 96 Civ. 7916 (RWS),
96 Civ. 7917 (RWS).

United States District Court,
S.D. New York.

Dec. 13, 1996.

Weil, Gotshal & Manges L.L.P., New York City, Otto G. Obermaier, Brian S. Rosen, Richard H. Epstein, Nadja Webb, Michael Straus, of counsel.

Bainbridge & Straus, Birmingham, AL, for Plaintiff.

Baker & Hostetler, Washington, DC, for Defendants, Mark A. Cymrot, Janinne D. Herrera, Paul O. Gagnier, of counsel.

### OPINION

SWEET, District Judge.

Plaintiff Elliott Associates, L.P. ("Elliott") has moved by order to show cause for writs of prejudgment attachment pursuant to Fed. R.Civ.P. 64 and Article 62 of the New York Civil Practice Law and Rules (N.Y. CPLR § 6201 *et seq.*) against the assets and interests of Defendants Republic of Peru ("Peru") and Banco de la Nacion ("Banco") (collectively, "Defendants"). For the reasons set forth below, the writs of attachment will be denied.

### Parties

Elliott is a limited partnership organized and existing under the laws of the State of

Delaware, and authorized to do business in the State of New York with its principal place of business at 712 Fifth Avenue, New York, New York 10019.

Banco is a foreign financial institution organized and existing under the laws of Peru with its principal place of business at Av. Nicolas de Pierola 1065, Lima 1, Peru.

Peru is a foreign state as defined in 28 U.S.C. § 1603(a).

### Prior Proceedings

Elliott commenced these actions on October 18, 1996 in the Supreme Court of the State of New York, County of New York, seeking money judgments based upon allegations of Banco's default under certain written loan agreements and Peru's default under a written guaranty securing certain loan agreements. Peru and Banco removed these actions to this Court on October 21, 1996.

Plaintiffs filed the instant motions by orders to show cause on October 30, 1996. Oral argument was heard on November 19, 1996. Post-argument submissions were received until December 4, 1996, at which time the matter was deemed fully submitted.

### Facts and Background

#### I. Historical Background

This action arises against the backdrop of Peru's efforts to resolve its foreign debt crisis. The history of the Peruvian debt crisis is fully canvassed in the prior opinions of this Court in the related action, *Pravin Banker Assocs. v. Banco Popular del Peru*, No. 93 Civ. 0094. *See Pravin Banker Assocs. v. Banco Popular del Peru*, 165 B.R. 379, 381–82 (S.D.N.Y.1994) ("Pravin I"); *see also Pravin Banker Assocs. v. Banco Popular del Peru*, No. 93 Civ. 0094, 1995 WL 102840 (S.D.N.Y. March 8, 1995) ("Pravin II"); *Pravin Banker Assocs. v. Banco Popular del Peru*, 895 F.Supp. 660 (S.D.N.Y.1995). A brief synopsis of the relevant history is provided here.

In March 1983, Peru determined that it had insufficient foreign exchange reserves to service its foreign debt. In an effort to resolve its liquidity problems, Peru entered negotiations with the Bank Advisory Committee for Peru (the "BAC"), a committee consisting of representatives of Peru's major commercial creditors. The BAC and Peru negotiations culminated in the imposition of limitations on the ability of privately and publicly owned Peruvian companies and banks to repay debt on foreign currency loans. The negotiations also yielded letter agreements perfected on May 31, 1983 (the "Letter Agreements") among, *inter alia*, Peru, Peruvian banks and their foreign creditors restructuring debts owed to the creditors.

After further negotiations stalled in 1984, Peru imposed further restrictions on payment of foreign exchange debt to prevent the depletion of its reserves. As a result, Peru fell into arrears on debts to various multinational organizations, foreign nations, and foreign commercial lenders.

In March 1989, United States Treasury Secretary Nicholas Brady revised United States policy on international debt. The new policy, known as the "Brady Plan," encouraged commercial bank creditors to voluntarily reduce the debt obligations of poor countries, such as Peru.

Beginning with the election of President Alberto Fujimori in 1990 and continuing with agreements between Peru and the International Monetary Fund, Peru began to restructure its economy. By late 1992, Peru could report substantial improvements resulting from the restructuring, including control over previously explosive rates of inflation. Although Peru has increased its reserves, Defendants maintain that Peru's outstanding foreign debt obligations still exceed the reserves available to service such debt. Declaration of Jorge Peschiera in Opposition to Writs of Attachment ("Peschiera Decl.") ¶¶ 12–14.

Peru has recently entered into a new round of negotiations to repay its commercial creditors. On October 27, 1995, Peru and the BAC announced an agreement in principle for a debt restructuring plan designed in accordance with the policies of the Brady Plan. The proposed restructuring covers virtually all of the external commercial debt owed by Peru and Peruvian public and pri-

vate-sector debtors, including the debts involved in this lawsuit.

On June 4, 1996, Peru and the BAC issued a term sheet setting forth the specific elements of Peru's proposed "Brady" debt restructuring agreement (the "Brady Agreement"). Roughly 180 creditors, collectively holding 99% of Peru's commercial debt, have indicated that they will participate in the Brady Agreement. Peru and all of the creditors represented on the BAC have signed the agreement, and Defendants expect the remaining creditors to sign in the coming weeks. According to Defendants, only Elliott and Pravin Banker Associates, the plaintiff-creditor in the *Pravin* cases previously before this Court, have openly opted out of the Brady Agreement and determined to enforce their debts by other means. The Brady Agreement is scheduled to close on December 20, 1996, at which time funds for the closing, including escrow and collateral arrangements, will be within the jurisdiction of this Court, and thus subject to attachment.

## II. *The Debts Held by Elliott*

On February 1, 1996, this Court entered judgment for Pravin Banker Associates, Ltd. in the amount of $2,083,234.71. Peru's motion before this Court for an emergency stay was denied on February 8, 1996. After soliciting and receiving comments from the Executive Branch, the Second Circuit also denied a motion for an emergency stay on April 12, 1996. The appeal in *Pravin Banker* is *sub judice,* having been argued on September 11, 1996.

On March 29, 1996 and April 19, 1996, Elliott purchased $20,682,699.04 (face value) of debt arising from certain of the May 31, 1983 Letter Agreements. The first purchase of debt took place after the denial of the stay by this Court in *Pravin Banker.* The second purchase of debt took place seven days following the denial of the emergency stay in the Court of Appeals. Although not part of the record here, it is presumed that these purchases were made in the so-called secondary market at an undisclosed discount from the face value sought to be enforced in this proceeding. Plaintiffs have attached to the complaint against Banco (the "Banco Complaint") one such assigned Letter Agreement, the original parties to which were Banco, Wells Fargo Bank, and Peru. Pursuant to these Letter Agreements among Banco and Banco Popular del Peru (another Peruvian state-owned bank) as obligors, and Peru as guarantor, and the banks and financial institutions parties thereto (together with their successors and assigns, collectively, the "Creditors"), the Creditors agreed to extend the time for repayment of certain loans. Elliott purchased and was assigned all of the right, title and interest of the Creditors.

Pursuant to the 1983 Agreements, Banco agreed to repay loans in the amount of $7,000,000 (in principal) on extended maturity dates and to make quarterly interest payments with respect to the loans at a variable interest rate calculated in accordance with the terms of the 1983 Agreements.

The 1983 Agreements further provide that an "Event of Default" occurs if, among other reasons, any principal or any interest on the Loans or any other sum payable by Banco thereunder shall not be paid in full within ten days of when due.

The 1983 Agreements further provide that Banco shall pay, on demand, all of the Creditor's costs and expenses to enforce the 1983 Agreements, including reasonable attorneys' fees and disbursements.

Pursuant to a guaranty, also dated May 31, 1983, Peru agreed to guarantee the repayment of certain debts owed by Banco and Banco Popular under the Letter agreements. Under Section 3 of the guaranty, Peru agreed that its liability with respect to the guaranty would be absolute and unconditional irrespective of any circumstance which might constitute a defense available to Peru.

Elliott purchased and was assigned all of the right, title and interest of certain Creditors with respect to an aggregate total $20,682,699.04 (face value), together with all accrued interest thereon. The total consists of the $7,000,000.00 borrowed by Banco and $13,682,699.04 borrowed by Banco Popular, all of which was guaranteed by Peru.

Pursuant to the 1983 Agreements and the Guaranty, Peru agreed to repay the Loans on the terms described above.

All of the letter agreements at issue also provide that a creditor "may assign all or any part of [its] interest in this letter to any financial institution."

On May 17, 1996 Elliott representatives discussed the possibility of settlement with Peru's counsel. Elliott rejected the terms of the Brady Agreement and raised the possibility of attaching Peruvian assets in New York. Peschiera Decl. ¶ 9. By letter dated June, 25, 1996, Elliott demanded that Peru pay Elliott the outstanding principal and interest on or before June 27, 1996. Affidavit of Jay Newman in Support of Writ of Attachment (Peru) ("Newman Aff.") ¶ 12. On September 27, 1996, Elliott representatives met with Peru's debt negotiator in an effort to negotiate a resolution. Newman Reply Aff. at ¶ 5. Elliott threatened to bring suit if payment in full was not forthcoming. *See* Peschiera Decl. at ¶¶ 9, 11. Banco has failed to pay any of the outstanding amounts due on the debts held by Elliott under the 1983 Agreements. Banco has not asserted any counterclaims. Counsel for Defendants represented that Elliott may still enter the Brady Agreement.

Peru has yet to satisfy two outstanding judgments totaling over $10 Million entered by the United States District Court for the Southern District of New York. Elliott refers to *Banco Cafeteria (Panama) S.A. v. The Republic of Peru*, 94 Civ. 3569 (JSM), in which a judgment was entered against Peru in the amount of $8,037,812.50 on October 3, 1995. The Court's records do not indicate that the judgment has been satisfied. In addition, Elliott points to the fact that a judgment was entered against Peru in the amount of $2,083,234.71 plus interest on February 1, 1996, *Pravin Banker Associates, Ltd. v. Banco Popular del Peru and the Republic of Peru*, 96 Civ. 7183 (RWS), and that Peru has sought stays of enforcement of these judgments, and posted a bond to lift a post judgment attachment pending resolution of the appeal. Moreover, Elliott asserts that counsel for Defendants has stated that Pravin will be unable to enforce any judgments against Peru. In addition, Elliott alleges that Peru has sold and is in the process of selling certain government owned and con-trolled entities which "is bringing in billions of dollars to the government's coffers." Newman Aff. at ¶ 17 and Ex. 2.

Defendants contend that Elliott has also sued the Republic of Panama, seeking and obtaining a writ of attachment, but only after Panama's Brady agreement had closed.

*Discussion*

Attachment pursuant to Rule 64 is available as a prejudgment remedy "under the circumstances and in the manner provided by the law of the state in which the district court is held." Fed.R.Civ.P. 64. Article 62 of the New York Civil Practice Laws and Rules ("CPLR") governs attachment procedures in New York.

A party seeking a prejudgment attachment in New York must show, "by affidavit and such other written evidence as may be submitted, that there is a cause of action, that it is probable that plaintiff will succeed on the merits, that one or more grounds for attachment provided in section 6201 exist and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." CPLR § 6212(a) (McKinney 1980 & Supp.1996).

Elliott has alleged that Banco has failed to meet its obligations under letters of credit assigned to Elliott to repay $7,000,000.00 in principal presently due and owing and that Peru has failed to meet its absolute and unconditional guaranty of repayment of $20,-682,699.04 in principal presently due and owing Elliott. Defendants do not dispute that these allegations state a cause of action.

Section 6201 of the CPLR provides, in relevant part, that "[a]n order of attachment may be granted in any action, ... when ... the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state." CPLR § 6201(1). Defendants do not dispute that they are non-domiciliaries or foreign corporations within the meaning of § 6201(1). Thus, Plaintiffs satisfy the requirement that "one ... of the grounds for attachment provided in section 6201 exist[s]."

Defendants have not asserted any counterclaims and do not dispute that Elliott's de-

mand would exceed any counterclaims they might assert.

However, Defendants contend that Elliott has not sustained its burden of showing a probability of success on the merits. Specifically, Defendants contend that Elliott cannot recover because: (1) it purchased the debts at issue in violation of New York champerty laws and (2) Elliott is not a proper assignee of the debt under the terms of the letter agreements.

Defendants also argue that, even if Elliott has satisfied the technical requirements for issuance of a writ of attachment, this Court should exercise its discretion to deny attachment because of the risk that attachment will "unravel" Peru's Brady Agreement with its foreign creditors, with harsh results on the Peruvian economy and people.

## I. *Plaintiff Has Established a Probability of Success on the Merits*

### A. *Defendant Has Failed to Make A Sufficient Showing of Champerty*

■ Defendants contend that Elliott's claims are unenforceable under section 489 of the New York Judiciary Law because the Peruvian loans were allegedly purchased for the purpose of bringing suit. Section 489 provides, in pertinent part:

> [n]o corporation or association, directly or indirectly ... shall solicit, buy or take assignment ... of a bond promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon. ...

N.Y. Judiciary Law § 489.

Elliott, as a limited partnership, is an "association" covered by § 489. *See* N.Y. Partnership Law § 10 (a "partnership is an association of two or more persons").

■ An assignment in violation of § 489 is void, and a claim acquired in this manner may not be enforced by the assignee. *See*

CIBC Bank & Trust Co. v. Banco Central do Brasil, 886 F.Supp. 1105, 1110 (S.D.N.Y. 1995).

■ The champerty prohibition was designed to cure the malicious stirring-up of litigation that would not otherwise have occurred, often by means of lawyers or corporations that took assignments in order "to enforce claims other than their own." *Pan–American Sec. Corp. v. Fried. Krupp A.*, 169 Misc. 445, 449, 6 N.Y.S.2d 993, 998 (Sup.Ct. Kings County 1938), *aff'd*, 256 A.D. 955, 10 N.Y.S.2d 205 (2d Dep't 1939).

■ The question of champertous intent is a fact-intensive inquiry. *CIBC*, 886 F.Supp. at 1110. Under New York law, a defendant asserting the affirmative defense of champerty must demonstrate that the plaintiff acquired the claim for the "sole" or "primary" purpose of bringing suit. *Id.* at n. 6.[1]

Defendants assert that the required champertous intent can be inferred from the following facts: (1) Elliott purchased the Peruvian debt, at a substantial discount, just one week after the Court of Appeals denied Peru's motion for an emergency stay in the *Pravin* case, with the knowledge that Peru would not settle debt agreements outside of the parameters of the Brady Agreement; (2) Elliott knew that Peru was in default when Elliott made its purchases; and (3) Elliott has also sued the Republic of Panama in similar circumstances.

The question here is whether Defendants' allegations supporting its champerty defense are sufficient at this point of the proceeding to defeat Elliott's showing that it is likely to succeed on the merits.

Defendants' allegations do provide a basis for an inference of opportunistic behavior, and possibly even anticipation that litigation would be the most lucrative strategy, if not of champertous intent. The timing of some of the assignments after the denial of an emer-

---

1. In *Fairchild Hiller Corp. v. McDonnell Douglas Corp.*, 28 N.Y.2d 325, 330, 321 N.Y.S.2d 857, 860–61, 270 N.E.2d 691, 693 (1971), the Court of Appeals favorably cites two older decisions, one holding that the champerty rule "implies an exclusion of any other purpose," *Moses v. McDivitt*,

88 N.Y. 62, 65 (1882), and a second holding that "the statute is violated only if the primary purpose" of the assignment is to bring suit. *Sprung v. Jaffe*, 3 N.Y.2d 539, 169 N.Y.S.2d 456, 460, 147 N.E.2d 6, 8–9 (1957).

gency stay in the *Pravin* case, along with the knowledge that Peru would not be able to negotiate settlements outside the terms of the Brady Agreement without undermining the Brady agreement, suggest that in order to make a profit on the debt, which was presumably purchased at a discount fully adjusted for the Brady Agreement and the litigation risks as clarified by the rulings of this Court and the Court of Appeals, Elliott would have to bring a lawsuit to secure a judgment higher than the Brady Agreement's discount would allow (as Pravin Banker had done). *Cf. CIBC*, 886 F.Supp. at 1110 (timing of lawsuit immediately after right to sue accrued supports inference of champertous purpose).

The fact that Elliott knew that the debts were already in default may also suggest that Elliott purchased the debt with the intent to sue, particularly given Peru's reasonable resistance to settling outside the terms of the Brady Agreement.

Finally, Elliott's prior lawsuit against Panama, which was also negotiating a Brady agreement and in which Elliott also sought a writ of attachment, may give rise to an inference that Elliott pursues a conscious strategy of purchasing commercial debt owed by foreign sovereigns and state-owned entities trying to renegotiate their debt with the intent of bringing lawsuits.

■ However, Defendants' assertions, set forth without benefit of discovery, do not establish at this stage a sufficient factual basis to defeat Elliott's showing that it has a probability of success on the merits. First, the champerty statute has been narrowly construed, with a presumption that a debt is purchased for legitimate purposes. In *The President Arthur*, 25 F.2d 999, 1001 (D.C.N.Y.1928), the Court rejected a champerty defense, explaining:

> It has been held that an attorney is not prohibited from discounting or purchasing bonds and mortgages and notes, or other choses in action, either for investment or for profit, or for the protection of other interests, and such purchase is not made illegal by the existence of the intent on his part at the time of the purchase, which must always exist in the case of such pur-

chases, to bring suit upon them if necessary for their collection.

To constitute the offense, the primary purpose of the purchase must be to enable him to bring a suit, and the intent to bring a suit must not be merely incidental and contingent. *Moses v. McDivitt*, 88 N.Y. at 65. An assignment taken ... not for mere speculation upon the outcome of intended litigation, is not champertous or in violation of the state statute. *Sampliner v. Motion Picture Patents Co.*, 254 U.S. 233, 240, 41 S.Ct. 79, [81] 65 L.Ed. 240.

■ Moreover, when the plaintiff purchases all the rights and obligations in a given asset, as Elliott has done here, rather than purchasing a mere right to sue, it is more difficult to establish the requisite champertous intent. *See Pan–American*, 169 Misc. at 449, 6 N.Y.S.2d at 998 ("[T]he statute as amended was not intended to prohibit corporations from purchasing claims on their own behalf for value and bringing actions thereon.... It seems clear that when a corporation purchases a claim for value without reserving to the seller any rights therein, there is no basis for an inference that the corporation is thereby practicing law or is attempting to accomplish by indirection what cannot be directly accomplished under the statute").

*Banque de Gestion Privee—Sib v. La Republica de Paraguay*, 787 F.Supp. 53, 57 (S.D.N.Y.1992) ("*BGP*") also supports Elliott's contention that Defendants' allegations of champerty are insufficient to defeat the writ of attachment. In *BGP*, this Court (the Honorable Michael B. Mukasey) granted summary judgment, rejecting a champerty defense arising in a context similar to that in this case. Paraguay was sued by a French investment bank seeking to enforce payment obligations under various defaulted loans. The creditor had acquired its interests in the loans at a deep discount in the secondary market, pursuant to assignment agreements conveying "all right, title and interest" of the assignor. Paraguay asserted a champerty defense. The Court rejected the defense and entered summary judgment for the creditor. *Id.* at 57.

In *BGP*, defendants alleged the following facts in support of their allegations of champerty: (1) plaintiffs had acquired the claims pursuant to option contracts (by which they had to purchase the debt or sell it back to the assignor within 90 days) or contracts by which costs and profits would be shared with the assignors; (2) plaintiffs indicated that they were prepared to sue on the debts prior to acquiring them; and (3) plaintiffs sought a writ of attachment within two weeks of the assignment. The Court held that none of these facts raised triable issues of "champertous intent." *BGP*, 787 F.Supp. at 56–57 (options and sharing); *Id.* at 57 (statements of willingness to sue); *Id.* (immediate writ of attachment).

An inference of champertous intent is countered here because Elliott purchased the entire rights to the claims, without options or profit sharing arrangements, and because Elliott met with Peru's debt negotiator and counsel in an effort to negotiate a resolution and made a demand for payment, albeit for the face value of the debt.

■ Elliott's knowledge that the Defendants' were in default at the time of the assignment does not necessarily establish a factual finding of champerty in this case. When the assignee gives the debtor an opportunity to cure a default before suing upon an assigned debt, the fact that the assignee knows of the default prior to assignment is insufficient to give rise to an inference of champertous intent. *See 1015 Gerard Realty v. A. & S. Improvements, Corp.*, 91 A.D.2d 927, 928, 457 N.Y.S.2d 821, 822 (1st Dep't 1983) ("That the purpose in purchasing the mortgage was not to bring suit is evident from the offer of plaintiff to permit the defaults to be cured."); *Limpar Realty v. Uswiss Realty Holding*, 112 A.D.2d 834, 836, 492 N.Y.S.2d 754, 755 (1st Dep't 1985). The fact that Elliott gave Peru an opportunity voluntarily to cure the default, and thus avoid an action on the debt, could militate against a finding that it took the assignments with the primary purpose of bringing suit depending on the circumstances surrounding those discussions.

Defendants' allegations that Elliott purchased the debt with prior knowledge of Peru's default and of the Second Circuit's denial of the emergency stay application, standing alone, are also insufficient to defeat the showing of a likelihood of success on the merits. First, Defendants' assertion that the only way Elliott could make a profit on the debt is by bringing suit is speculative. There is no evidence of the amount Elliott paid for the debt or what forms of consideration passed in the assignment. Moreover, it is conceivable that Elliott anticipated an increase in the value of the debt independent of litigation-induced increases. In addition, as discussed above, the knowledge of default is not sufficient to give rise to an inference of champerty. In *1015 Gerard Realty*, for example, the purchaser bought a mortgage with knowledge that the debtor was in default. It gave the debtor an opportunity to cure before bringing suit. The Appellate Division held that this fact vitiated the champerty defense and required that summary judgment be awarded for the creditor.

■ Finally, it is difficult to establish champertous intent from Elliott's earlier suit against Panama. First, a single prior lawsuit does not constitute a pattern sufficient to infer a strategy of buying lawsuits. Moreover, a similar defense was raised and rejected in *Pan–American*, 169 Misc. at 448–49, 6 N.Y.S.2d at 997–98, where the creditor had also commenced a number of suits in Holland, Switzerland and France on similar defaulted bonds.

In sum, although Defendants' allegations do suggest that Elliott was pursuing an opportunistic investment strategy that may have involved a high likelihood of litigation, the factual support to establish the intent necessary for an affirmative champerty defense, especially in light of the narrow construction given to the champerty statute, is insufficient to defeat Elliott's showing of a likelihood of success on the merits at this stage of the litigation.

**B.** *The Assignment to Elliott is Valid*

■ Defendants contend that the assignments from banking institutions to Elliott were invalid because Elliott is not a "financial institution" within the meaning of

the Loan Agreements. This issue was raised and rejected by this Court in *Pravin III*, 895 F.Supp. at 667. *Pravin III* recognized that, under New York law, contracts are freely assignable in the absence of "clear language expressly prohibiting assignment." *See Sullivan v. Int'l Fidelity Ins. Co.*, 96 A.D.2d 555, 465 N.Y.S.2d 235, 238 (2d Dep't 1983). *Pravin III* then held that the letter agreement's provision stating that the original creditor "may assign all or any part of [its] interest in this letter agreement to any financial institution" did not "contain any express words of limitation on assignability. Moreover, none of the parties undertook to define 'financial institution,' indicating that the term ... is one of general description rather than precise restriction on the type of party that may be an assignee." *Pravin III*, 895 F.Supp. at 667–68.

Defendant Peru, as a party to the Pravin litigation, is .collaterally estopped from raising the assignability issue. *See Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979) (recognizing non-mutual collateral estoppel). While Banco, as a non-party to the *Pravin* action, is not technically estopped from litigating the issue here, the reasoning of *Pravin III* is fully applicable in this case. The provisions allegedly limiting assignment in the Letter Agreements here is worded identically to the provisions at issue in *Pravin*.

Defendants attempt to distinguish *Pravin III* on the ground that Pravin owned a broker-dealer, and was thus a "financial institution" within the meaning of the agreement. Here, Elliott has .made no showing that it is or owns a financial institution. This Court did note that if the assignment provision had been intended to limit assignability, it would interpret "financial institution" to include broker-dealers in accordance with the definition in the U.S. Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5311 (1982). *Pravin III*, 895 F.Supp. at 668 n. 8. The Court's holding, however, did not rest on this observation but on an interpretation of the Letter Agreement that held that there was no limitation on assignability.

Accordingly, the assignment to Elliott was proper.

## II. *Discretion Will Be Exercised to Deny Attachment*

The granting of prejudgment attachments pursuant to CPLR §§ 6201 and 6212 "is discretionary with the district courts, and even when the statutory requisites are met, the order may be denied." *Filmtrucks, Inc. v. Earls*, 635 F.Supp. 1158, 1162 (S.D.N.Y. 1986) (citing *Trigo Hnos., Inc. v. Premium Wholesale Groceries, Inc.*, 424 F.Supp. 1125, 1133 (S.D.N.Y.1976)).

"[T]he provisional remedy of attachment is 'a harsh remedy which should be construed strictly against those seeking to use it.'" *Meridien Int'l Bank Ltd. v. Republic of Liberia*, No. 92 Civ. 7039, 1996 WL 22338, *2 (S.D.N.Y. Jan. 22, 1996) (quoting *Reading & Bates Corp. v. Nat'l Iranian Oil Co.*, 478 .F.Supp. 724, 726 (S.D.N.Y.1979)); *see also Thornock v. Kinderhill Corp.*, 712 F.Supp. 1123, 1132 (S.D.N.Y.1989) (citations omitted) ("even if plaintiffs had made the required showings, it would still be possible to deny the harsh remedy of attachment, for attachment is a discretionary remedy").

When attachment is sought pursuant to § 6201(1) to secure a judgment, rather than to obtain jurisdiction over nondomiciliaries, "attachment should issue only upon a showing that drastic action is required for security purposes." *Incontrade, Inc. v. Oilborn Int'l, S.A.*, 407 F.Supp. 1359, 1361 (S.D.N.Y.1976) (citations omitted); *see also Meridien*, 1996 WL 22338, at *2–3 (order of attachment denied, where attachment sought for security rather than jurisdiction and plaintiff failed to establish need for attachment); *Ames v. Clifford*, 863 F.Supp. 175, 177 (S.D.N.Y.1994) (citations omitted) ("New York courts have required an additional showing that something, whether it is a defendant's financial position or past and present conduct, poses a real risk of the enforcement of a future judgment"); *General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F.Supp. 1070, 1073 (S.D.N.Y.1994) (citations omitted) ("[g]enerally, this Court has held that attachment for security purposes is only appropriate when plaintiff will have difficulty enforcing a judg-

ment and, accordingly, should issue only upon a showing that drastic action is required").

Here, the complaints allege personal jurisdiction over the Defendants. Banco Compl. at ¶¶ 3–5; Peru Compl. at ¶¶ 3–6. Defendants have not contested jurisdiction. Thus, Elliott seeks attachment for security purposes, *Meridien*, 1996 WL 22338, at *3 ("Attachment cannot be justified in this case as necessary to obtain jurisdiction as the complaint alleges that there is jurisdiction over the Defendants" (citing complaint)), and bears the burden of establishing the need for the attachment. *Id.* at *4.

Elliott asserts that it needs the attachment because Peru has a history of refusing to satisfy judgments entered against it. Elliott cites as an example *Banco Cafetero (Panama) S.A. v. The Republic of Peru,* 94 Civ. 3569 (JSM), in which a judgment was entered against Peru in the amount of $8,037,812.50 on October 3, 1995. Elliott asserts that the Court's records do not indicate that the judgment has been satisfied. In addition, Elliott points to the fact that a judgment was entered against Peru in the amount of $2,083,234.71 plus interest on February 1, 1996, in *Pravin Banker*. Peru has not satisfied this judgment, but following the grant of post-judgment remedies by the federal trial court, Peru posted a bond to secure the judgment pending its appeal. The appeal has not yet been decided.

Moreover, counsel for Peru allegedly represented to counsel for Pravin Banker Associates, Ltd., that Pravin Banker will not be able to enforce any judgment it obtains against Peru.

Finally, Elliott alleges that Peru has sold and is in the process of selling certain government-owned and controlled entities. Elliott claims it needs an attachment to prevent Peru from removing assets that would be a basis for enforcing Elliott's eventual judgment in this action.

Elliott's contentions may create some concern about their ability to enforce any judgment they may obtain. However, the facts alleged do not necessarily give rise to an inference that Defendants will seek to avoid a valid final judgment. For example, Defendants in the *Pravin* action had the right to appeal the judgment, seek a stay of enforcement and post a bond pending final resolution. Their choice to do so does not suggest a disrespect for valid judgments. Moreover, the failure to satisfy the judgment in *Banco Cafetero* to date is unexplained. The statements of Peru's counsel that Pravin will not be able to enforce its judgments are ambiguous at best. Finally, the fact that Peru is selling government-controlled entities does not mean that fewer of Peru's assets will be available to satisfy a judgment. Both Defendants by definition under the facts established are responsible institutions participating in international financial markets.

Moreover, Elliott should not be heard to complain of the risk that it will be unable to collect on a potential judgment. Collecting from Banco and Peru will be no more difficult after judgment was entered than it was at the time Elliott acquired the Letter Agreements. Elliott had reason to believe when it purchased the debt that Peru would not negotiate a separate settlement with them, for doing so would undermine Peru's credibility with its other creditors. Elliott has been invited to participate in the Brady Agreement and is still able to do so. Elliott knowingly risked the possibility that it would be unable to collect the full debt, yet its only demand upon Elliott has been for full payment. If Elliott wishes to reduce its risk of a total loss, it may participate in the Brady Agreement.

The risk that attachment of Peruvian assets would present to Defendants' Brady Agreement also counsels strongly in favor of denying attachment at this time. Since 1989, U.S. policy has strongly favored voluntary renegotiation and rescheduling of foreign debts to commercial creditors. In 22 U.S.C. § 286dd(2), Congress established a policy of "encourag[ing] borrowing countries and banking institutions to negotiate, where appropriate, a rescheduling of debt which is consistent with safe and sound banking practices and the country's ability to pay." Defendants cite the support of the IMF and other international agencies for the Brady process in this case, as well as Statements of

Interest filed by the United States Department of Treasury in other cases. *See, e.g.,* Statement of Interest of the United States of America in Opposition to First Amended Complaint at 17, *CIBC,* 886 F.Supp. 1105 (S.D.N.Y.1995). Defendants urge that principles of international comity articulated in *Pravin I,* 165 B.R. at 384–85, would be offended by issuing a writ in this case.

Although it is difficult to predict the effect of an attachment in excess of $20 million on the consummation of the Brady Agreement, attachment certainly creates an avoidable risk of jeopardizing the Agreement. Participating creditors may be induced to pull out of the Agreement by the prospect of opportunistic creditors with ever larger claims obtaining priority over them by commencing litigation. *Cf. Ames v. Clifford,* 863 F.Supp. 175, 178 (S.D.N.Y.1994) (order of attachment denied where attachment would permit plaintiff to obtain priority over other creditors of decedent's estate). A breakdown in the Brady Agreement could undermine Peru's fledgling recovery and upset the stability of an economy struggling to meet the most basic needs of its people.[2]

As Elliott correctly asserts, Defendants' policy arguments alone would be insufficient to defeat an ultimate judgment against them. In *A.I. Credit Corp. v. Government of Jamaica,* 666 F.Supp. 629, 633 (S.D.N.Y.1987) and *National Union Fire Ins. Co. v. People's Republic of the Congo,* 729 F.Supp. 936, 944–45 (S.D.N.Y.1989), the Courts granted summary judgment even though the plaintiffs were creditors who refused to reschedule foreign debts despite the financial difficulties of the foreign debtor. Both decisions cited the leading case of *Allied Bank International v. Banco Credito Agricola de Cartago,* 757 F.2d 516 (2d Cir.1985) (*"Allied II"*).

In *Allied II,* the Second Circuit reversed the lower court and granted Allied Bank's motion for summary judgment over defendant's comity-based arguments. In particular, the Second Circuit held that allowing the foreign sovereign to refuse payment of financial obligations "would vitiate an express provision of the contract[ ] between the parties," something the Court of Appeals concluded would be "inconsistent with the law and policy of the United States." 757 F.2d at 522. Thus, the Second Circuit found that any "cooperative adjustments" of sovereign debt were "grounded in the understanding that, while parties may agree to renegotiate conditions of payment, the underlying obligations to pay nevertheless remain valid and enforceable." 757 F.2d at 519.

In *Pravin III,* this Court stated:

The Brady Plan does not abrogate the contractual rights of creditor banks, nor does it compel creditors to forbear from enforcing those rights while debt restructuring negotiations are ongoing, or prohibit them from "opting out" of settlement resulting from such negotiations. *Id.* at 666.

*See also National Union Fire Ins.,* 729 F.Supp. at 944–45 ("If this Court were to refuse to enforce this default judgment on the ground that to do so would interfere with the Congo making payments pursuant to a debt rescheduling agreement entered into with other creditors, it would have the effect of depriving a creditor of its right to choose whether to reschedule a debt or to enforce the underlying obligation to pay. Such a result would be contrary to United States policy as articulated in *Allied Bank* ").

Elliott asserts that these decisions require issuance of an order of attachment in this case. However, the cases cited all relate to the entry of judgment after a finding for the plaintiffs on the merits, not the issuance of an order of prejudgment attachment before discovery and before the merits have been reached. The entry of such an order, unlike the entry of judgment, is discretionary with

---

2. In post-argument submissions, Elliott proposed a more limited order of attachment that would have excluded "any property brought into New York solely for the purpose of serving as collateral [for the Brady closing] until January 31, 1997." In practice, this limitation is insufficient to protect the Brady Agreement. First, it does not protect property other than "collateral" that must be brought into New York to effectuate the Brady closing (such as payment of certain principal and interest and the funding of escrows). Moreover, the attachment would still undermine the credibility of the Brady process by granting a priority to opportunistic creditors pursuing aggressive litigation strategies, to the detriment of those creditors who have agreed to follow the more conciliatory approach encouraged by U.S. policy.

# 1214

the court. Although Elliott has made a threshold showing of a probability of success on the merits, ultimate success on the merits is hardly a foregone conclusion. In addition, the *Pravin* case, upon the validity of which recovery in this case depends, is currently on appeal. This leaves the legal position upon which Elliott relies in some doubt. Moreover, Defendants are entitled to discovery upon their allegations of champerty which may require a factual hearing upon a full record. *CIBC,* 886 F.Supp. at 1110.

 Given the significant concerns about the consequences of an attachment to the pending Brady Agreement and the Peruvian economy, the uncertainty of the facts underlying the affirmative defense and Elliott's ability to protect its investment by participating in the Brady Agreement, this Court will exercise its discretion to deny the writs of attachment. Where, as here, "attachment is likely to be oppressive ... and may work irremediable hardship, discretion of the court is called in aid of the oppressed." *Trigo Hnos.,* 424 F.Supp. at 1133; *see, also Meridien,* 1996 WL 22338, at *4–5; *Interpetrol Bermuda v. Trinidad and Tobago Oil Co.,* 135 Misc.2d 160, 169, 513 N.Y.S.2d 598, 604–05 (Sup.Ct.N.Y. County 1987) (vacating attachment appropriate upon showing of hardship and respect for friendly foreign sovereign).[3]

## Conclusion

For the reasons set forth above, Elliott's applications for writs of attachment are hereby denied.

It is so ordered.

---

**3.** Elliott attempts to distinguish *Meridien, CIBC, Trigo Hnos.,* and *Interpetrol Bermuda,* cases in which courts exercised discretion to deny writs of attachment even though plaintiffs had satisfied the technical requirements of the attachment statute. It is true, as Elliott points out that in *CIBC* and *Meridien,* the Executive Branch submitted Statements of Interest with respect to U.S. policy toward the foreign countries involved, whereas here no such statement has been submitted. The absence of a Statement of Interest, however, does not diminish the general policy of the Brady Plan and 22 U.S.C. § 286dd(2).

Elliott also contends that in *Meridien, Trigo Hnos,* and *Interpetrol Bermuda,* there were indications that funds to satisfy an eventual judgment would be available in the jurisdiction. *See Meridien,* 1996 WL 22338, at *4; *Trigo Hnos,* 424 F.Supp. at 1133; *Interpetrol Bermuda,* 135 Misc.2d at 168, 513 N.Y.S.2d at 604. Here, Elliott asserts that Defendants have indicated that no assets will be available to satisfy a judgment. As stated above, although Elliott's assertions may raise some concerns about the enforceability of later judgments, the consequences of an attachment at this time outweigh such concerns.